LESTER RADASZEWSKI, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Metropolitan Water Reclamation District, Appellee).

First District (Industrial Commission Division)    Nos. 1—98—1764WC, 1—98—1952WC cons.

Opinion filed June 15, 1999.

James R. Branit, of Bullaro, Carton & Stone, of Chicago, for appellant.

Michael G. Rosenberg and Diane M. Shelley, both of Metropolitan Water Reclamation District of Greater Chicago, of Chicago, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant, Lester Radaszewski, filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (the Act) (820 ILCS 310/1 et seq. (West 1996)) for a chronic inflammatory and infectious sinus condition that he developed while working for the

Metropolitan Water Reclamation District (employer). The arbitrator found that claimant sustained an accidental injury that arose out of and in the course of his employment and that his condition was causally connected to the injury. He awarded temporary total disability (TTD) benefits of $453.33 for a period of $218^{4}/_{7}$ weeks and a wage differential award pursuant to section 8(d)(1) of the Act in the amount of $163.08 for the duration of claimant's disability. The Industrial Commission (the Commission) affirmed the arbitrator's decision on TTD benefits but reversed the arbitrator's wage differential award, awarding instead permanent partial disability of 20%. On administrative review, the circuit court of Cook County confirmed.

Claimant appeals, contending that the Commission's decision finding claimant was not entitled to a wage differential award is against the manifest weight of the evidence. Additionally, employer has filed a cross-appeal, contending that the Commission's decision finding a causal connection between claimant's employment and his condition of ill-being and its permanency award is against the manifest weight of the evidence. Because we conclude that the manifest weight of the evidence demonstrates that a contrary result is clearly apparent, we reverse the Commission's decision denying a wage differential. We affirm the remainder of the Commission's decision.

## FACTS

Claimant has been a carpenter since 1966. He began working for employer as a carpenter in January of 1975. Before beginning, he was given a physical examination. There were no findings or problems related to his sinuses. Claimant worked in employer's sewage treatment plant in various positions where he was exposed to raw sewage, various chemicals and cleaning agents, bacteria, smoke, and dust from wood, paint, and rust. Claimant worked without an inhalation device and testified that he was never offered one. In the summer of 1975, claimant developed persistent cold symptoms, including constant nasal drip, a runny nose, stuffiness, sinus problems, watery eyes, and difficulty breathing. He also developed polyps in his nasal cavity. He underwent conservative treatment including antibiotics, antihistamines, nasal sprays, and steroid treatment. Because his problems were not resolved, he underwent nine surgical procedures over the next 11 years to remove polyps and to scrape the nasal and sinus passages. Following each procedure, claimant improved for a period of time but, upon returning to his work duties, redeveloped the polyps, infections, and severe problems. At some point, claimant's condition deteriorated to the point that it eroded part of his skull and a pin was placed behind his left eye to hold the socket to the skull. Additionally, over the course

of his illness, claimant developed chronic sinus infections, migraines, chronic upper respiratory infections, short-term blindness, balance problems, and brainstem dysfunction. He was given several allergy tests, the results of which were negative. The record does not disclose precisely what claimant was tested for.

Claimant treated with the following doctors: Dr. Albert Lorenz, his family physician; Dr. John Stopka, otolaryngologist; Dr. David Bytel, otolaryngologist; Dr. Michael Goldman, otolaryngologist; Dr. Sherman, neurologist; and Dr. Allen Putterman, opthamologist. Claimant was examined by the following physicians: Dr. Edward Applebaum, otolaryngologist, who saw claimant for a second opinion regarding one of his surgeries; Dr. John Goldman, infectious diseases specialist, who examined claimant to ascertain whether his condition was caused by an infectious disease; Dr. Edward Bleier, who saw claimant in connection with his disability benefits; and Dr. Peter Orris, occupational disease specialist, who was contacted to render an opinion concerning claimant's condition.

Claimant was also seen by two doctors for independent medical examinations at employer's request. In December of 1988 he was examined by Dr. John McMahan, who concurred with claimant's treating doctors' opinions that claimant's work environment caused his condition. He was also seen by Dr. William Brice Buckingham, an internal medicine specialist. Dr. Buckingham concluded that claimant's problems were due to a severe allergic reaction but he could not say what claimant was allergic to. He further stated that many people who live in big cities like Chicago suffer from chronic sinus problems due to pollutants. He opined that claimant could return to his previous position as a carpenter. Dr. Buckingham did admit that he could not state with any degree of medical certainty whether claimant was allergic to his work environment.

As a result of his illness, claimant lost his sense of smell, which has never returned. At the time of arbitration he continued to suffer from double vision, laziness in his eye, constant nasal drip, congestion when he lies flat thus necessitating him to sleep sitting up, pain behind the eyes and in his sinuses when the weather changes, migraines, pain in his eye where the pin is, and auditory brainstem dysfunction that impairs his balance.

Claimant received ordinary disability benefits that were paid from his pension fund from August 18, 1986, until March of 1989, during which time he was off work and his symptoms diminished somewhat. From June of 1989 until November of 1990, he assisted his uncle who owned a liquor store, serving as a salesclerk, without pay.

Claimant returned to work for employer on November 1, 1990, as

an engineer technician III, which was basically a clerical position with a pay cut of approximately $13,000. However, he testified that he worked in the same environment as before but was now given an inhalation mask. He worked in this capacity until July of 1991. In July, he was advised he was going to lose his status as a carpenter and, because he could not afford the pay loss, he resigned the position. He sought reinstatement as a carpenter. However, claimant has never been recalled to work and has not worked since he resigned.

The arbitrator concluded that claimant was entitled to TTD benefits for $218^4/_7$ weeks (from August 18, 1986, until October 31, 1990) of $453.33 per week. He further concluded that claimant was disabled from pursing his usual and customary employment because he was required to avoid all respiratory irritants, including dust and sawdust. Therefore, he awarded claimant a wage differential of $163.08 for the duration of his disability.

The Commission affirmed the TTD award and concurred that claimant was not able to return to work as a carpenter for employer. It vacated the wage differential award, however, finding that claimant was only to avoid chemical irritants not dust or sawdust and, therefore, could possibly be a carpenter elsewhere. It found that claimant was 20% permanently partially disabled and awarded him $293.61 for 100 weeks.

The circuit court confirmed, finding that the Commission reasonably could interpret all of the medical evidence to find that, although claimant could not return to work for employer, he could nevertheless do carpentry work elsewhere. The court noted that the Commission's sole reliance on Dr. Orris' report was its prerogative. It further found that inherent in the Commission's finding was the inference that Dr. Orris did not believe that sawdust was a respiratory irritant or a substance that created a contaminated environment. Further, regarding Dr. Orris' statement that, because claimant was susceptible to dizzy spells, he should only use power tools and ladders with extreme caution, the circuit court inferred that Dr. Orris believed claimant could return to work as a carpenter; otherwise, he would not have issued such a warning.

## ANALYSIS

### I. Causal Connection and Permanency

Employer has filed a cross-appeal, alleging that claimant's condition was not causally connected to his work for employer. It also argues that the condition was a temporary aggravation and, therefore, claimant is not entitled to any permanency award. If employer's contentions are correct, examination of claimant's wage differential issue is

unnecessary. We therefore address the cross-appeal first. Employer argues that claimant had a "non-occupational chronic sinus condition which was temporarily aggravated when he worked in the wastewater treatment facility." His condition has subsequently subsided and there is no ongoing disability to sustain a permanency award.

■ Employer's contention concerning causal connection is without merit. There is clearly ample evidence to support a finding that claimant's condition was causally related to his work. All of the following doctors related claimant's condition to his work environment: Dr. Michael Goldman, claimant's treating otolaryngologist, stated that claimant's condition was due to his exposure to sawdust, solvents, and irritants. He ruled out allergies, anatomic deformities, and trauma as the cause. Additionally, he noted that when claimant was separated from the work environment and, thus, the irritants, his symptoms and conditions improved. Dr. John Goldman also stated that claimant's exposure to sawdust, solvents, and other irritants was central to his medical problems. Similarly, Dr. Orris stated that claimant's exposure to chemicals at work stimulated his problems. According to him, if claimant returned to the same environment, his conditions would reoccur. Dr. Edward Bleier noted that claimant's treating doctors all attributed his condition to his work environment. He appears to defer to their opinion and stated that he did not believe claimant could return to work for employer. Dr. John McMahan, one of employer's examining doctors, agreed with claimant's treating physicians that his condition was caused by the work environment. The only doctor who did not relate claimant's condition to his work environment was Dr. Buckingham, employer's expert. He stated that claimant could return to work for employer. However, he did admit that claimant's problems were due to a severe allergic reaction. Moreover, he could not say with any degree of medical certainty that claimant's work environment did not cause his condition.

There is also sufficient evidence to find that claimant's condition was permanent. At arbitration he continued to suffer from double vision, laziness in his eye, constant nasal drip, congestion when he lies flat thus necessitating him to sleep sitting up, pain behind his eyes and in his sinuses when the weather changes, migraines, pain where the pin is, and auditory brainstem dysfunction that impairs his balance. While many of his symptoms had improved, there is no evidence his condition was entirely resolved.

Based on the medical evidence and claimant's physical condition, the Commission could reasonably conclude that his condition was causally related to his employment and that he was left with a residual disability that warranted a permanent disability award.

## II. Wage Differential Award

Claimant contends that the Commission's decision reversing the wage differential award is against the manifest weight of the evidence. He states that the issue boils down to whether he can work as a carpenter outside of employer's work environment. He contends that the medical evidence as a whole demonstrates that his sinuses are so degenerated that he is to avoid *all* irritants, not just chemicals, and, therefore, he cannot work as a carpenter. According to claimant, the Commission committed the following errors in arriving at its decision. First, the Commission misinterpreted Dr. Orris' opinion by erroneously relying on only two statements in his June 5, 1989, report and by ignoring his deposition testimony that claimant was to avoid *all* irritants. Further, the Commission ignored the balance of the medical evidence, which demonstrates that he is required to avoid all irritants. Finally, the Commission ignored his current physical condition and remaining symptoms, including but not limited to the eroded bone and damaged brainstem. In sum, claimant contends that the Commission's decision is against the manifest weight of the evidence.

■ Claimant must prove two elements to be entitled to a wage differential award: (1) a partial incapacity which prevents him from pursuing his "usual and customary line of employment," and (2) an impairment of his earnings. *Albrecht v. Industrial Comm'n*, 271 Ill. App. 3d 756, 759 (1995). If claimant's injury does not prevent him from pursuing his usual type of employment, he is not entitled to a wage differential award. Similarly, if claimant's injury does not reduce his earning capacity, he is not entitled to a wage differential award. *Albrecht*, 271 Ill. App. 3d at 759. This type of award is based on the presumption that, but for the injury, the employee would be in the full performance of his duties. *Albrecht*, 271 Ill. App. 3d at 759. A worker is considered disabled if he can no longer perform his job "without endangering his life or health." *Owens-Corning Fiberglas Corp. v. Industrial Comm'n*, 66 Ill. 2d 247, 252 (1977). Whether claimant has presented sufficient evidence of each element is a question of fact for the Commission, whose decision will not be reversed unless it is against the manifest weight of the evidence. *Consolidation Coal Co. v. Industrial Comm'n*, 265 Ill. App. 3d 830, 838 (1994). " 'The manifest weight of the evidence is that which is "the clearly evident, plain and indisputable weight of the evidence." [Citations.] In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent.' [Citation.]" *Drogos v. Village of Bensenville*, 100 Ill. App. 3d 48, 54 (1981), quoting *In re Application of County Collector*, 59 Ill. App. 3d 494, 499 (1978).

The crucial question in the instant case is whether there is suf-

ficient evidence to establish that claimant could work as a carpenter in some position outside of employer's environment without endangering his health.

The Commission relied entirely upon Dr. Orris' report dated June 5, 1989, which states:

"[Claimant] should not return to work as a carpenter in an environment in which he will be exposed to any respiratory irritants and/or high levels of airborne bacteria. \*\*\* From the standpoint of his respiratory condition, he appears fit at this time to return to work as a carpenter in an uncontaminated environment. However, because of the vestibular dysfunction, which develop during the course of his illness, the possibility exists that he may become dizzy at any time. Extreme caution should therefore be exercised should his work involve the use of electric power saws, ladders, scaffolds, or other such equipment."

There is, however, other evidence in the record on claimant's ability to be exposed to irritants other than chemicals, *e.g.*, dust and sawdust. In particular is the deposition of Dr. Orris, taken in 1993 and 1994, apparently for the express purpose of clarifying his 1989 report. In his deposition, Dr. Orris testified that when he last saw claimant in August of 1993, although improved, he was still suffering from many problems, including nasal irritation, sensitivity to light, coughing in conjunction with postnasal drip, and upper respiratory and nasal stuffiness. According to him, if claimant were to return to the same environment, his problems would reoccur and, ultimately, he would develop obstructive lung disease. Dr. Orris did state claimant would be able to work in other environments; he just could not be exposed to irritants, chemicals, and sewage. Dr. Orris testified:

"The chemicals that I identified earlier [hydrogen sulfide, hydrogen chloride, sodium hypochlorite] are the ones that *stimulated* the problem, but he *must avoid exposure to all respiratory irritants* at this stage, as well as sewage and bioaerosols, where possible. That would include secondhand cigarette smoke and other things of this sort." (Emphasis added.)

According to Dr. Orris, dust is a respiratory irritant.

Dr. Orris also testified that claimant had a predisposition to continuing problems with his nasal passages and sinuses, particularly a propensity to develop infections or more serious infections due to the fact his nasal cavities are no longer normal. With regard to claimant's ability to return to work, the following testimony was elicited.

"A. \*\*\* Mr. Radaszewski should not return to work as a carpenter in an environment in which he will be exposed to any respiratory irritants and/or high levels of airborne bacteria.

Q. So absent an environment where he is exposed to these things, then he could return to work as a carpenter?

A. *I don't know how he will return to work as a carpenter and avoid those exposures. It's inherent in the work of a carpenter to have such exposure.*" (Emphasis added.)

Ultimately, Dr. Orris stated claimant would be able to work in an environment where there are no respiratory irritants, including smoke. He stated that an office environment should provide a setting in which claimant could work.

Dr. John Goldman, infectious disease specialist, authored a letter dated October 8, 1985. It stated in pertinent part:

"His history of exposure to sawdust, solvents, and other irritants is quite remarkable and in my opinion central to his medical problems now. I discussed this at some length with the patient, advising him to consider and to discuss with his primary physicians, the *possibility of changing his career at this time to avoid all exposure to possibly offending materials.* This includes complete abstinence from smoking. I believe that discontinuing exposure to all of these irritants will have a high likelihood of at least lessening the patient's problems and it is conceivable that they will abate altogether once the offending agents are removed from his environment. \*\*\*

It is clear that suggesting a change of this magnitude in his life should not be taken lightly but it is equally clear that the problem is now of such a magnitude that it threatens his long-range health very significantly." (Emphasis added.)

Dr. Edward Bleier examined claimant in connection with his pension disability benefits. In his first report, Dr. Bleier stated:

"[I]t has been recommended by patient's specialist, that his conditions in the work place, being exposed to sawdust, noxious gases, and sewage contents have a significant influence on his chronic condition. It has therefore been recommended by his multiple specialists, that this gentleman avoid exposure to these agents, and should avoid his present work conditions, for at least one year, in an attempt to alleviate his conditions.

At present, I have very little to offer in this case, I can only state that Mr. Radaszewski, as per the recommendations of his physicians avoid his present work conditions."

Dr. Bleier reexamined claimant in October of 1986 and wrote that claimant has been seen by many physicians and "[t]hey all seem to feel this is due to irritants from the environment. *They all suggested he have a change in occupation.*" (Emphasis added.)

"This man is a carpenter, and they feel that should he return to his normal job as a carpenter, his condition will become progressively worse. They state in their reports that he should stay in an

atmosphere with minimal irritants, for at least a period of one to two years, before he could have any improvement in his condition. *** [I]n my opinion, [claimant] will never be able to return to work at the Sanitary District as a carpenter."

Claimant was again examined by Dr. Bleier in January of 1987, at which time Dr. Bleier stated "[a]ll of these physicians [Dr. Goldman, otolaryngologist; Dr. Sloan, internist; Dr. Sherman, neurologist; and Dr. Putterman, ophthalmologist] after thorough examinations and studies have decided that his problem is due to exposure to a dusty environment, and as a carpenter, certainly his exposure to this type of environment happens every day." Finally claimant was seen by Dr. Bleier on January 21, 1988. At that time, Dr. Bleier reported that he had reports from numerous well-qualified physicians who had seen claimant.

"[A]ll have given the opinion that he could not continue working in dusty atmospheres and must have a change of occupation, where he could do some type of an office procedure under air conditioned premises.

I am of the opinion, that his primary care doctors and his specialist, who have been taking care of him, will not allow him to resume work as a carpenter at any time in the future. I feel the only way this patient could resume a gainful occupation would be that he be assigned at some time to a change in environment, probably an office position ***." (Emphasis added.)

Dr. Michael Goldman, claimant's treating otolaryngologist and surgeon, gave an evidence deposition. He opined that the recurrences of claimant's conditions were "related to chronic inflammation, persistence of that inflammation, and exposure to any type of irritant that would cause inflammation." Moreover, he believed that claimant would be exposed to such irritating agents in his work environment that would exacerbate his condition. Dr. Goldman found it significant that once claimant was away from his work environment his condition improved. This demonstrated he was "no longer being exposed to those irritants which would cause inflammation of the nasal and sinus cavities." Dr. Goldman wrote in a February 6, 1986, letter:

"Of special import in consideration of Mr. Radaszewski's health is his type of work. The patient is a carpenter and engineer for the Metropolitan Sanitary District, and has frequent exposure to sawdust, noxious gases, and contents of sewage. ***

It is clearly recognized that these inhalants are extremely inflammatory to the nasal and sinus mucosa. *** His intense exposure to sawdust, solvents, and irritants may be central to his medical health problems. It would be of great benefit if Mr. Radaszewski could separate himself from exposure to these agents." (Emphasis added.)

In his deposition, Dr. Goldman testified claimant's condition was not due to allergies, anatomic deformities, or trauma. He also did not believe that claimant's past exposures to Agent Orange, malaria, or asbestos fibers were the cause of his problems. Therefore, the only suggested etiology was claimant's history of recent exposure to irritating agents.

Even Dr. John T. McMahan, otolaryngologist, who examined claimant at employer's request on December 16, 1988, agreed. He noted that claimant was exposed to sawdust, raw sewage, and other chemicals. He stated:

> "[B]ecause of the severity of his sinusitis, bone erosion and potential central nervous system involvement, I would strongly advise him not to work in a contaminated environment. Although sinusitis can occur in people who do not work in these environments, the history of initiation of his problem after working there, and the cessation of his problem since he left, there is strong circumstantial evidence supportive of the hypothesis that his work condition contributed to his sinusitis."

Although Dr. Buckingham, who also examined claimant at employer's request, stated claimant could return to work as a carpenter for employer, he admitted claimant's problems were due to a severe allergic reaction. Importantly, he could neither say what claimant was allergic to nor could he state to any degree of medical certainty whether claimant was allergic to employer's work environment. Thus, although Dr. Buckingham stated claimant could return to work for employer, he did not state that doing so would not endanger claimant's health.

■ There is substantial evidence in the record to demonstrate that claimant cannot be exposed to dust and sawdust and, therefore, cannot return to work as a carpenter in any environment. The clear, evident, plain, and indisputable weight of the medical testimony favors claimant, particularly in light of the fact that Dr. Orris' deposition was taken for the purpose of explaining his report. All doctors specifically mentioned dust and/or sawdust in their reports. Although we are reluctant to overturn the Commission's decision on factual questions, this is a case where an opposite conclusion is clearly apparent. The only evidence to support the Commission's decision is the two statements in Dr. Orris' report. However, as noted, Dr. Orris' deposition was taken specifically to explain this report. Accordingly, his deposition testimony cannot be ignored. Further, although employer relies on Dr. John Goldman because he did not restrict claimant from working as a carpenter and he stated that removal from the environment would abate his conditions which in fact occurred, employer fails to

consider the balance of Dr. Goldman's opinion. In particular, Dr. Goldman stated that claimant should consider a change of occupation. Also, he stated that claimant's condition was of such magnitude that it threatened his long-term health. Further, Dr. Goldman was not one of claimant's treating physicians but rather examined him to ascertain whether claimant was suffering from an infectious disease. Clearly, this doctor's opinion does not assist employer. Finally, there is no evidence in the record from which we can infer that there are carpenter positions available with environments that are completely free from dust, sawdust, chemicals, or solvents and in which electric tools, ladders, or scaffolds are not required—the only type of environment claimant's physicians have stated claimant cannot work in.

Based on the foregoing evidence, we find that the Commission's decision reversing the wage differential award is against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, we reverse the Commission's decision finding that claimant is not entitled to a wage differential award. We affirm the balance of the Commission's decision. We remand to the Commission to proceed in accordance with this decision.

Affirmed in part and reversed in part; cause remanded.

McCULLOUGH, P.J., and COLWELL, HOLDRIDGE, and RARICK, JJ., concur.