FIRST ASSIST, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Mary Khatri, Appellee).

Fourth District (Illinois Workers' Compensation Commission Division)

No. 4—06—0206WC

Argued January 18, 2007.—Opinion filed January 31, 2007.

Allen C. Mueller (argued), of Livingstone, Mueller, O'Brien & Davlin, P.C., of Springfield, for appellant.

James W. Ackerman (argued), of Ackerman Law Office, of Springfield, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, Mary Khatri, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2000)), seeking benefits for injuries she received on January 6, 2000, while in the employ of First Assist, Inc. (First Assist). The Industrial Commission (Commission)[1] awarded the claimant benefits, including a weekly wage differential award pursuant to section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2000)). The circuit court of Sangamon County confirmed the Commission's decision, and this appeal followed.

The following factual recitation is taken from the evidence adduced at the arbitration hearing.

The claimant commenced her employment with First Assist in June 1991. She was employed as an operating room nurse, and her duties consisted of assisting doctors during surgery, including: handing the doctor instruments; retraction and holding a patient's extremities; washing parts of a patient's body; moving patients from a holding area into the operating room; lifting patients on and off of the operating table; hooking up machinery and equipment; and mixing drugs. According to the claimant, her duties required overhead lifting in a number of the functions she was required to perform.

The claimant testified that, on January 6, 2000, she was transferring a 350-pound patient from the operating room table to a stretcher when she felt a pop in her left shoulder. She stated that she walked to the recovery area, gave a report of the incident, and immediately went downstairs to the Memorial Medical Center emergency room and sought treatment. The claimant was diagnosed as suffering from a left shoulder strain, given pain medication, and advised by the emergency room physician to follow up with an orthopedic doctor if she was not better within a "couple of days."

The claimant sought follow-up treatment from Dr. Mark Greatting on January 10, 2000. Dr. Greatting diagnosed left-shoulder AC joint strain and impingement syndrome, and he prescribed a course of physical therapy. Dr. Greatting authorized the claimant to do light-duty work with no lifting greater than 10 pounds with her left arm and no left-arm activity above shoulder level.

On January 24, 2000, Dr. Greatting administered a steroid injection and ordered an MRI scan of the claimant's left shoulder. The scan was performed at Memorial Medical Center on January 27, 2000. The report of that test states that an abnormal signal was present within

---

[1]Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." However, because the Industrial Commission was named as such when the instant cause was originally filed, we will use this name for purposes of consistency.

the distal most aspect of the supraspinatus tendon, a small effusion was detected, and a tiny amount of fluid was present in the subdeltoid bursa. The remaining tendons about the rotator cuff were found intact.

The claimant testified that she returned to full-duty work on February 14, 2000. According to the claimant, she never performed light-duty work as First Assist was unable to accommodate her restrictions. She stated that, after she returned to work, she experienced pain, numbness, and tingling. The claimant testified that, when the numbness and tingling were bad, she had no strength and would drop things.

During the following months, the claimant continued to treat with Dr. Greatting. The doctor's records reflect that the claimant complained of pain in her left shoulder and tenderness over her AC joint.

Conservative treatment having failed, Dr. Greatting recommended that the claimant undergo a left shoulder arthroscopy with arthroscopic subacromial decompression and a left distal clavicle resection which he performed on August 8, 2000. Dr. Greatting's postoperative diagnosis was left shoulder impingement syndrome with a partial articular surface rotator cuff tear and left acromioclavicular arthritis.

Subsequent to her surgery, Dr. Greatting recommended physical therapy three times per week for three weeks, commencing August 25, 2000. On September 13, 2000, Dr. Greatting prescribed continued physical therapy. The claimant was discharged from physical therapy on November 24, 2000.

On December 6, 2000, the claimant was examined by Dr. Michael Watson at the request of First Assist. He diagnosed impingement syndrome with rotator cuff tendonita. Dr. Watson's report of that examination states that the claimant's injury and subsequent treatment are causally related to her injury at work on January 6, 2000. Dr. Watson was of the opinion that the claimant had not reached maximum medical improvement (MMI) as of that visit, and he recommended that she continue with a home exercise program and gradually return to work in a limited capacity. Dr. Watson prescribed work restrictions, including no lifting of more than 10 pounds, no overhead lifting, and no lifting of patients with her left arm. Dr. Watson wrote that the claimant would need these work restrictions for two to three months, after which she should be able to return to full-duty work.

On December 14, 2000, Dr. Greatting again ordered physical therapy for the claimant. The plan was for three sessions per week for a period of four weeks. However, the claimant attended only one session on December 27, 2000.

The claimant next saw Dr. Greatting on January 11, 2001. The record of that visit reflects that the claimant reported experiencing increased pain during physical therapy. Additionally, she reported the onset of numbness in her left arm, radiating from her shoulder to her

fingers. Dr. Greatting recommended that the claimant remain off work and referred her to Dr. Leo Ludwig for a second opinion.

The claimant was examined by Dr. Ludwig on March 19, 2001. Dr. Ludwig's notes of that visit state that the claimant complained of pain in her left shoulder and numbness and tingling into the ulnar side of her forearm. He diagnosed left shoulder pain and a partial rotator cuff tear and recommended that the claimant undergo a functional capacity evaluation (FCE). Dr. Ludwig reported his findings and recommendation to Dr. Greatting.

On April 4, 2001, Dr. Watson again saw the claimant at the request of First Assist. In a report of that visit, Dr. Watson noted that the claimant continued to complain of pain in her left shoulder. Dr. Watson's examination revealed that the claimant had lost range of motion since his last examination. He recorded an impression of continued impingement in the subacromial space and a conclusion that the claimant's surgery had a "failed outcome." According to Dr. Watson's report, the claimant had reached MMI, and, without further treatment, she will have permanent restrictions which include no lifting, pushing or pulling greater than 10 pounds, no lifting of patients, and no overhead lifting with her left arm. According to Dr. Watson, the claimant could assist in general surgery cases and pass instruments below shoulder level, but she should not be required to hold any body extremities during orthopaedic surgery.

When the claimant saw Dr. Greatting on April 5, 2001, she continued to complain of pain and decreased range of motion in her left shoulder. Based upon Dr. Lidwig's recommendation, Dr. Greatting ordered a FCE.

On May 2-3, 2001, the claimant underwent a FCE. The report of that evaluation states that the therapy staff did "not foresee *** [the claimant] tolerating her previous position as an operating nurse at this time due to her current limitations of the left upper extremity." The report states that the staff did "not foresee *** [the claimant] tolerating sustained use of the upper extremity most specifically with overhead or extended reaches *** [or] tolerating sustained forces through the upper extremity." The report also notes, however, that the claimant has the "physical capabilities to progress her functional levels if she is motivated to do so." Another trial of physical therapy was recommended.

The claimant next saw Dr. Greatting on May 24, 2001. The notes of that visit reflect that the claimant continued to complain of pain in her left shoulder. Dr. Greatting recommended a new MRI scan, which was performed on June 7, 2001. The MRI showed a prior distal clavicle resection, mild atrophy, and mild osteoarthritis.

When the claimant saw Dr. Greatting on July 12, 2001, she complained of pain, weakness, and decreased range of motion in her

left shoulder. Dr. Greatting prescribed physical therapy and authorized the claimant to remain off work.

Dr. Greatting's notes of the claimant's September 6, 2001, visit state that the claimant attended some physical therapy sessions since her last visit. He noted that the claimant was still experiencing pain and her range of motion was limited. He recommended that the claimant continue to receive physical therapy three times per week for one month.

The claimant again saw Dr. Ludwig on September 20, 2001. This visit, however, was at the request of First Assist. In a letter to First Assist's adjusting service, Dr. Ludwig reported that the claimant was experiencing persistent pain in her left shoulder along with limited range of motion. Dr. Ludwig wrote that he did not feel that any further surgery was indicated and recommended that the claimant be sent to work hardening treatment for six weeks and then returned to restricted duties with no overhead use of her arm and no lifting in excess of 25 pounds. Dr. Ludwig opined that the claimant's current condition and complaints are related to her work injury.

The claimant continued to treat with Dr. Greatting. His notes reflect that she received additional physical therapy, but she never received approval to start work hardening. On January 3, 2002, Dr. Greatting concluded that the claimant had reached MMI and released her from care with the following permanent restrictions: no lifting of more than 25 pounds and no activity above shoulder level with the left arm.

The claimant testified that, when she was released to return to work, First Assist did not offer her a job within her permanent restrictions. According to the claimant, after she informed First Assist of her restrictions, she received a letter terminating her employment.

After the claimant demanded vocational rehabilitation services, Jim Ragains, a vocational rehabilitation consultant, was assigned by First Assist to help her in a job search. Ragains testified that he first met the claimant in March 2002. He stated that he developed a plan which required the claimant to compile a resume and cover letter, register for job-lead services with the Illinois Department of Employment Security, make a minimum of 10 employer contacts per week, provide documentation of her contacts, and accept a reasonable job offer. Ragains' responsibilities were to coordinate the plan, provide the claimant with job leads, follow up on the claimant's job search efforts, and issue reports on a monthly basis. According to Ragains, the claimant was not diligent in her job-seeking efforts. He testified that she never made more than the minimum weekly contacts, that she failed to contact the state employment service weekly, and that there were discrepancies "in terms of places where she had reportedly either applied or sent a resume." When Ragains was asked to elaborate on why

he believed that the claimant had not been diligent in her job-searching efforts and accurate in reporting her efforts on a job search log, the claimant's attorney interposed a hearsay objection to any testimony relating to conversations that Ragains may have had with any prospective employers. The objection was sustained, although Ragains was allowed to testify to his opinion that the claimant did not apply for work with all of the employers that she listed.

The claimant testified that, on November 13, 2002, she obtained a job within her restrictions working as an office nurse at Cardinal Respiratory. Her duties in that position involved giving injections, taking vital signs, and charting patient information. According to the claimant, she was paid $16/hour and worked in the position for about six weeks. She testified that she left the position because she could not get along with the doctor at the facility.

After she left the employ of Cardinal Respiratory, the claimant again demanded vocational rehabilitation services from First Assist. She testified that her request was refused and, thereafter, she began a job search.

The claimant testified that she secured a position with Capitol Care as a staff nurse in a nursing home. She stated that she makes $19/hour and that she was working in that position on June 2, 2003, the date of the arbitration hearing.

Bob Hammond, a vocational rehabilitation consultant, testified on behalf of the claimant. According to Hammond, First Assist was paying operating room nurses $43/hour as of the date of the arbitration hearing. He also testified that, in his opinion, the claimant was being paid the usual and customary wage for someone working as a nurse in a nursing home. According to Hammond, the claimant could not go back to work as an operating room nurse due to her 25-pound lifting restriction. He stated that, given the claimant's restrictions, "she is accommodating herself as well as the employer's [sic] accommodating her at probably the highest rate she would get in central Illinois." On cross-examination, however, Hammond admitted that he had not performed a labor market survey.

Ragains testified that he performed a labor market survey for the Springfield, Illinois, area and determined that the average hourly pay for a registered nurse is $24.44. He opined that there are jobs for which the claimant is qualified which pay more than she is currently making.

Following the arbitration hearing, the arbitrator found that the claimant sustained accidental injuries on January 6, 2000, arising out of and in the course of her employment with First Assist and awarded her 123³/₇ weeks of temporary total disability (TTD) benefits and permanent partial disability (PPD) benefits under section 8(e) of the Act (820 ILCS 305/8(e) (West 2000)) for a 50% loss of use of her left

arm. The arbitrator denied the claimant a wage differential award under section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2000)), finding that she failed to prove that she is prevented from pursuing her usual and customary line of employment or that she has suffered an impairment in earning capacity.

The claimant sought a review of the arbitrator's decision before the Commission. In a unanimous decision, the Commission modified the arbitrator's decision and awarded the claimant wage differential benefits in the sum of $640 per week pursuant to section 8(d)(1) of the Act in lieu of a PPD award pursuant to section 8(e). The wage differential was calculated based upon the difference between the claimant's salary of $19/hour as a staff nurse at a nursing home and the current rate of $43/hour being paid by First Assist to operating room nurses as established by Hammond's testimony. The Commission found that the claimant had established both that her work-related injury prevented her from preforming her usual and customary line of employment and that she suffered an impairment in earning capacity. In addition, the Commission awarded the claimant $123^3/7$ weeks of TTD benefits, as had the arbitrator.

First Assist filed a petition for judicial review of the Commission's decision in the circuit court of Sangamon County. The circuit court confirmed the Commission's decision, and this appeal followed.

In urging reversal of the circuit court's judgment, First Assist argues that the Commission's decision to award the claimant a wage differential benefit pursuant to section 8(d)(1) of the Act is against the manifest weight of the evidence. Its argument in this regard is premised upon two contentions; namely, that the claimant failed to prove that her work-related injury prevents her from preforming her usual and customary line of employment and that she introduced insufficient evidence of an impairment of earnings. We disagree.

■ In order to qualify for a wage differential award under section 8(d)(1) of the Act, a claimant must prove (1) a partial incapacity which prevents her from pursuing her "usual and customary line of employment" and (2) an impairment in earnings. 820 ILCS 305/8(d)(1) (West 2000); *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 730, 734 N.E.2d 482 (2000). Whether a claimant has introduced sufficient evidence to establish each element is a question of fact for the Commission to determine, and its decision in the matter will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Radaszewski v. Industrial Comm'n*, 306 Ill. App. 3d 186, 192, 713 N.E.2d 625 (1999). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992). That is to say, the Commission's

determination on a question of fact is against the manifest weight of the evidence when no rational trier of fact could have agreed. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 120, 675 N.E.2d 175 (1996).

First Assist contends that, because the claimant was employed as a registered nurse both at the time of her injury and at the time of the arbitration hearing, she failed to establish that her injury has prevented her from pursuing her "usual and customary line of employment." According to First Assist, the "[c]laimant here was a nurse and is a nurse." However, the claimant's testimony clearly establishes that all nurses do not perform the same functions, and Hammond's testimony establishes that all nurses are not paid the same.

The claimant testified to the duties of an operating room nurse and the physical requirements of the job, including the requirement that she lift patients on and off of the operating table. However, as an office nurse working for Cardinal Respiratory or a staff nurse working for Capital Care, the claimant was not required to lift patients. There is no question regarding the claimant's restrictions. It is uncontested that she was not permitted to lift more than 25 pounds. Her current position as a staff nurse falls within her restrictions; whereas, the functions of an operating room nurse do not. In addition, Hammond was clear in his testimony that the claimant's restrictions prevented her from working as an operating room nurse, as was the FCE report. Hammond's testimony also made clear the fact that all nurses do not earn the same salary. Operating room nurses are paid substantially more than office nurses or staff nurses, as the claimant's employment history corroborates. Even Ragains admitted that the $16/hour salary that the claimant was paid at Cardinal Respiratory and the $19/hour that the claimant earned at Capitol Care are appropriate for the jobs which she performed.

Contrary to First Assist's assertion, we do not believe that the Commission's determination that the claimant's usual and customary line of employment at the time of her injury was that of an operating room nurse is "too narrow and restrictive." We believe that the facts in evidence establish that, although all registered nurses might be members of the same profession, they do not all perform the same functions. Consequently, we do not believe that the Commission erred when it determined that the claimant's usual and customary line of employment at the time of her injury was that of an operating room nurse.

As an additional argument, First Assist asserts that "it is unclear what the claimant's true restrictions are, or whether they prevent her from returning to the job she was performing *** prior to her injury." Suffice it to say that nothing in the record supports this proposition. To the contrary, Drs. Greatting, Watson, and Ludwig all restricted the claimant from performing functions which were part of her regular

duties as an operating room nurse, and the FCE report states that the staff did "not foresee *** [the claimant] tolerating her previous position as an operating nurse at this time due to her current limitations."

■ Based upon the foregoing analysis, we conclude that the Commission's determination that the claimant's injury prevents her from pursuing her usual and customary line of employment, that of an operating room nurse, is not against the manifest weight of the evidence.

In support of its contention that the claimant failed to introduce sufficient proof of an earnings impairment, First Assist argues that its objections to the testimony of Hammond on the issue, the only evidence establishing that its current rate of pay for an operating room nurse of $43/hour, should have been sustained. Hammond testified that he called the number for First Assist which he got from the telephone directory and asked for a nurse recruiter. The individual who answered identified himself as Glen and stated that he was a nurse recruiter. It was this individual who, according to Hammond, informed him that the salary for an operating room nurse is $43/hour. First Assist objected to the testimony on two grounds; foundation and hearsay. However, neither objection was well taken and, therefore, properly overruled by the arbitrator.

The claimant's attorney laid a proper foundation for Hammond's phone conversation with First Assist's nurse recruiter. Hammond testified that he obtained the number for First Assist from the phone directory, that he dialed that number, and the person to whom he spoke identified himself as Glen, the nurse recruiter. The fact that Hammond did not recognize the voice of the person to whom he spoke and does not even know his full name does not render the evidence inadmissible. It is sufficient that Hammond called First Assist's business phone number which he obtained from a phone directory and spoke to an individual regarding First Assist's business activities. *Tomaszewski v. Godbole*, 174 Ill. App. 3d 629, 635, 529 N.E.2d 260 (1988); see also *Godair v. Ham National Bank*, 225 Ill. 572, 574-75, 80 N.E. 407 (1907).

On the question of whether Hammond's testimony regarding the content of his conversation is hearsay, we note the long-standing rule that admissions made by a party, or on its behalf, are admissible as exceptions to the hearsay rule. *Vojas v. K mart Corp.*, 312 Ill. App. 3d 544, 547, 727 N.E.2d 397 (2000). When, as in this case, the statement has been made by an employee of a party, the test for the application of the party-admission rule is whether the statement was made during the employment relationship and concerning matters within the scope of that employment. *Vojas*, 312 Ill. App. 3d at 548. The statements of "Glen," First Assist's nurse recruiter, satisfies both requirements.

Having rejected First Assist's evidentiary objections to Hammond's testimony regarding his telephone conversation with First Assist's nurse recruiter concerning the salary paid to an operating room nurse, we are left with Hammond's testimony establishing the rate of pay as $43/hour. The claimant testified that, at the time of her injury, the number of hours that she worked per week was "pretty much" left up to her. Some weeks she worked more than 40 hours, some weeks less. However, she also testified that she worked much of a "full-time basis" given the flexibility she had in terms of leaving early. Based upon this evidence, we believe that the Commission might properly have drawn the conclusion that the claimant's earnings impairment was the difference between a 40-hour work week at $43/hour and the claimant's present earning capacity of $19/hour.

As competent evidence in the record supports a finding that the claimant's injury both prevents her from pursuing her usual and customary line of employment as an operating room nurse and has resulted in an ascertainable impairment of her earnings, we find that the Commission's determination that the claimant is entitled to a wage differential award pursuant to section 8(d)(1) of the Act is not against the manifest weight of the evidence.

■ First Assist also argues that the arbitrator erred in sustaining the claimant's objection to Ragains' testimony regarding the basis for his opinion that she had not been diligent in her job search. However, in its opinion the Commission specifically noted First Assist's offer of proof wherein Ragains testified that he based his opinion on conversations he had with potential employers. Had the Commission not intended to consider the testimony, there would have been no reason to refer to it. Consequently, we are unable to conclude that First Assist suffered any prejudice as a consequence of the arbitrator's ruling on the matter.

■ Finally, First Assist argues that the Commission erred, as a matter of law, by fixing the claimant's wage differential award at $640/week, as the maximum allowable award for a wage differential applicable to this case is the maximum PPD rate in effect on January 6, 2000; namely, $485.65/week. The claimant agrees and, as a consequence, we vacate the amount of the claimant's wage differential award and remand this cause to the Commission with instructions to modify its decision so as to award the claimant a weekly wage differential benefit in the amount of $485.65/week.

Based on the foregoing analysis, we vacate that portion of the circuit court's judgment which confirmed the Commission's award of a wage differential in the sum of $640/week, affirm the circuit court's judgment in all other respects, and remand the matter to the Commis-

sion with directions to modify its decision so as to award the claimant a wage differential benefit in the amount of $485.65/week.

Affirmed in part and vacated in part; cause remanded to the Workers' Compensation Commission with instructions.

McCULLOUGH, P.J., and GROMETER, HOLDRIDGE, and DONOVAN, JJ., concur.