YELLOW FREIGHT SYSTEMS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Jeffrey Labonte, Appellee).

First District (Industrial Commission Division)    No. 1—03—2572WC

Opinion filed August 4, 2004.—Rehearing denied September 1, 2004.

James P. Roach, of Hennessy & Roach, P.C., of Chicago, for appellant.

David F. Feuer, of Goldstein, Fishman, Bender & Romanoff, of Chicago, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Claimant, Jeffrey Labonte, sought benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1996)) for injuries he sustained on April 5, 1998, while employed by Yellow Freight System, Inc. (employer). After a hearing, the arbitrator determined that claimant suffered an aggravation of a preexisting shoulder condition, which resulted in surgery. The arbitrator awarded claimant temporary total disability benefits (TTD) of $520.07, for a period of 47¹/₇ weeks and $305.50 for reasonable and necessary medical expenses. The arbitrator found that as a result of the accident, claimant was only capable of doing "medium" work due to permanent restrictions of not lifting more than 40 pounds and frequent lifting of up to only 25 pounds. The arbitrator further found the shoulder injury resulted in 45% loss of the use of claimant's left arm under section 8(e) of the Act and a back injury resulted in 5% disability of the person as a whole under section 8(d)(2). The arbitrator refused to award claimant a wage differential award pursuant to section 8(d)(1) of the Act.

The employer sought review with the Illinois Industrial Commission (Commission). The issues raised were the extent of claimant's permanent partial disability and whether claimant was entitled to a wage differential. The Commission agreed with the arbitrator that

claimant failed to prove he was entitled to a wage differential under section 8(d)(1) of the Act. The Commission modified the permanency award, finding claimant permanently partially disabled to the extent of 40% under section 8(d)(2) of the Act, and ordered the employer to pay claimant $439.89 per week for a period of 200 weeks. The Commission further modified by finding claimant was not entitled to any benefits under section 8(e) of the Act.

The circuit court of Cook County reversed the Commission's award of permanent partial disability benefits under section 8(d)(2), finding instead that claimant was entitled to wage differential benefits pursuant to section 8(d)(1) of the Act, and remanded to the Commission for a determination of benefits under section 8(d)(1). In all other respects, the Commission's decision was affirmed. Upon remand, the Commission, with one dissent, determined that claimant was entitled to wage differential benefits of $361.34 per week, commencing March 2, 1999, for the duration of his disability. In his dissent, Commissioner Stevenson adhered to his original decision that an award under section 8(d)(2), rather than a wage differential, was the appropriate remedy. The circuit court confirmed the majority's decision. We affirm.

## FACTS

Claimant began working for the employer in 1987. Over the years, he worked as both a dockworker and a spotter. The dockworker position required significant overhead lifting, and the spotter position required him to lift trailers off a "pintlehook." In order to start work with the employer, claimant was required to take a preemployment physical, which he passed. In 1987, claimant did not have any problems with his neck or back.

In 1990, claimant suffered a cervical injury, which required C-5 and C-6 fusion surgery. He received a workers' compensation settlement for that injury and resumed his regular employment in 1991. During 1992 and 1993, claimant experienced soreness in his left shoulder, and in 1994, he reported a back injury. The parties stipulated that claimant suffered a work accident on April 5, 1998, while cranking down dolly legs on a trailer. Claimant attempted to pull a pin two or three times and felt immediate pain in his left shoulder. Claimant also felt pain in his lower back when he pulled on the pin. Claimant reported the accident to his supervisor and was treated at the emergency room at Alexian Brothers Hospital.

On July 15, 1998, claimant underwent arthroscopic surgery on his left shoulder, followed by physical therapy. Dr. Weidman, the surgeon who performed the surgery, ordered permanent restrictions of no lifting over 40 pounds and frequent lifting of only 25 pounds. Both Dr.

Weidman and Dr. Gnadt, claimant's other treating physician, opined that as a result of the April 5, 1998, accident claimant suffered an aggravation of a preexisting condition, which resulted in the need for surgery and permanent restrictions. The employer's examining doctor opined that claimant merely suffered a shoulder strain on April 5, 1998, and claimant's shoulder problems were chronic in nature and a separate issue.

Claimant, age 43 at the time of the accident, testified that he still experiences shoulder pain, which is particularly painful when he sits too long or reaches overhead. He is no longer able to bowl or play basketball. Claimant testified that he did not graduate from high school. He dropped out after the eleventh grade and started pumping gas. He then worked in a foundry/machine shop. He also did landscaping, worked as a switchman for a railroad company, worked as a box handler, worked as a freight handler, and worked as a bartender before accepting his position with the employer. When claimant originally applied for the job with the employer, he wrote on the application that he was a high school graduate.

After shoulder surgery and therapy, claimant began working with Tracy Peterlin, a vocational consultant retained by the employer. Peterlin advised claimant that a security officer position would be appropriate for him. Peterlin even composed a report advising claimant of several security companies that were hiring and that he should contact those companies about employment. The salary range for such a position was $6 to $8 per hour. Claimant testified he made $19.15 per hour as a dockworker and approximately $19.30 as a spotter.

Claimant secured a job with Metro Milwaukee Auto Auction prior to meeting with Peterlin. The job pays $7 per hour. Claimant works 32 hours per week, which is considered full-time, and receives health benefits. Claimant testified that he accepted the position after he contacted the employer about the job and was told that it was acceptable and he should take it. Karen Tolbert was the person who told claimant it was okay for him to take the job. Tracy Peterlin's report specifically states that she spoke with Karen Tolbert, who said it was fine that claimant accepted the position. Tolbert told Peterlin to keep the file open for 30 days and if claimant was still working, the file could be closed.

On cross-examination, claimant acknowledged that he had been living in Franklin, Wisconsin, and commuting to Illinois for five years prior to his work accident. The parties stipulated that claimant was advised of job openings with the employer in July 1999, some five months after accepting a position as a security guard. The employer introduced the job descriptions for three positions open in July 1999:

associate dock operations supervisor, shift operations manager, and dock supervisor. The shift operations manager position required a bachelor's degree or equivalent combination of education and experience, as well as experience as a front-line supervisor. The dock supervisor position did not require a bachelor's degree, but a bachelor's degree and previous supervisory experience were considered a plus. It also required the applicant to have the ability to train and motivate others and have a good knowledge of the bargaining unit agreement. The associate dock operations supervisor position required a high school education or equivalent and one to two years' work experience, along with knowledge of computer applications and proficient keyboard skills.

Claimant testified that he did not have the skills required for the three positions. For example, claimant is unable to type due to a previous injury to his finger. Claimant has not looked for any other jobs since accepting the position as a security guard. In his 1987 job application, claimant set forth that in addition to working as a bartender, he was also a manager for the same bar from 1983-87. He also claimed additional managerial experience with a company called Carry Light, Inc.

After hearing all the evidence, the arbitrator awarded TTD benefits and found claimant's shoulder injury resulted in 45% loss of the use of claimant's left arm under section 8(e) of the Act and the back injury resulted in 5% disability of the person as a whole under section 8(d)(2). The arbitrator refused to award a wage differential. The Commission initially agreed that claimant was not entitled to a wage differential. The Commission modified the permanency award, finding claimant permanently and partially disabled to the extent of 40% under section 8(d)(2) of the Act, but refusing to award benefits under section 8(e) of the Act. The circuit court reversed the Commission's permanent partial disability award under section 8(d)(2), finding instead that claimant was entitled to a wage differential pursuant to section 8(d)(1) of the Act and remanded for a determination of benefits under section 8(d)(2). In all other respects, the circuit court confirmed. Upon remand, the Commission determined that claimant was entitled to wage differential of $361.34 per week. The circuit court confirmed. The employer now appeals.

## ANALYSIS

The issue raised on appeal is whether claimant has proven that he is partially incapacitated from pursuing his usual and customary line of employment as required to receive a wage differential award under section 8(d)(1) of the Act. The employer maintains that the circuit

court ignored the proper standard of review when reviewing the Commission's first decision, and, upon remand, the Commission erred in awarding claimant a wage differential under section 8(d)(1) of the Act. The employer contends that the circuit court provided no analysis as to why the Commission's decision denying claimant a wage differential was against the manifest weight of the evidence, and the circuit court erred in reversing.

A review of the circuit court's original order shows that the circuit court specifically stated that the Commission's award of permanent partial disability benefits, rather than a wage differential, was against the manifest weight of the evidence and contrary to the law. The circuit court summarized its analysis as follows:

> "The [claimant] proved a partial incapacity which prevented him from pursuing his usual and customary line of employment which [the employer] conceded was true. He also proved an impairment of earnings. He proved, because of the injury, he could only earn less than when he was working for the respondent prior to the injury. Therefore, the [c]ourt finds the decision of the Commission to award [claimant] permanent partial disability benefits pursuant to § 8(d)(2) instead of wage differential benefits pursuant to § 8(d)(1) is against the manifest weight of the evidence and contrary to law."

The circuit court correctly analyzed the evidence in the instant case and concluded that the manifest weight of the evidence indicated claimant was not qualified for the three positions suggested by the employer five months after he accepted a position as a security guard.

The circuit court pointed out that while the Commission initially determined that claimant did not put forth enough effort to find employment within his physical restrictions and employment background, this finding "conflicted with the Commission's finding the security guard position was suitable employment for [claimant] based on his education, physical restrictions and experience." The circuit court also reasoned that because the employer approved the security guard position and told its vocational counselor to close claimant's file if he was still employed after 30 days with the subsequent employer, the manifest weight of the evidence did not support the Commission's finding that claimant was not entitled to a wage differential.

■ It is well settled that in order to qualify for a wage differential award pursuant to section 8(d)(1) of the Act, a claimant must prove: (1) partial incapacity which prevents pursuit of his "usual and customary line of employment" and (2) impairment of earnings. 820 ILCS 305/8(d)(1) (West 1996); *Gallianetti v. Industrial Comm'n*, 315 Ill.

App. 3d 721, 728, 734 N.E.2d 482, 488 (2000). On the other hand, under section 8(d)(2) of the Act, in addition to TTD, a claimant receives compensation for that percent of 500 weeks that his partial disability bears to his total disability. 820 ILCS 305/8(d)(2) (West 1996). In general, section 8(d)(2) applies to cases in which a claimant suffers injuries that partially incapacitate him or her from pursuing the usual and customary duties of his line of employment, but do not cause him or her to suffer an impairment of earning capacity. 820 ILCS 305/8(d)(2) (West 1996); *Gallianetti*, 315 Ill. App. 3d at 728-29, 719 N.E.2d at 488. In *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 438, 433 N.E.2d 671, 673-74 (1982), our supreme court expressed a preference for wage differential awards over scheduled awards. If a claimant requests a wage differential and proves that he or she qualifies for one, the plain language of section 8(d)(1) requires that he or she be awarded a wage differential award. *Gallianetti*, 315 Ill. App. 3d at 729, 734 N.E.2d at 488.

◼ In the instant case, the employer conceded that claimant could not continue in his usual and customary line of work as a dock worker or spotter. The employer arranged for a vocational expert to assist claimant in a job search. The vocational expert listed security guard as a position that would be appropriate for claimant given his education, experience, and physical restrictions. The vocational expert set forth that claimant could expect to make between $6 and $8 per hour in such a position. Prior to meeting with the vocational expert, claimant obtained employment as a security guard, earning $7 per hour. Claimant testified he works 32 hours per week, which is considered full-time. His new employer provides health insurance for him and his wife, who has diabetes. Claimant checked with the employer and was told that the job as a security guard was appropriate and he should go ahead and accept the position. Accordingly, his meeting with the vocational expert was cancelled. The employer told the vocational expert to keep the file open for 30 days and if claimant was still employed with the security company, she should go ahead and close the file.

We are unconvinced by the employer's contention that claimant's failure to apply for three jobs with the employer some five months after accepting a permanent position as a security guard disqualifies him for a wage differential. Because the employer did not offer claimant any of the three positions, but merely gave claimant notice of the positions, we find the offer in the instant case similar to the sham offer made by the employer in *Reliance Elevator Co. v. Industrial Comm'n*, 309 Ill. App. 3d 987, 723 N.E.2d 326 (1999).

In *Reliance Elevator*, there was no medical opinion that the

employee was permanently and totally disabled; nevertheless, the court found the employee met his burden of demonstrating he was permanently and totally disabled by showing that he contacted over 3,600 potential employers without success. 309 Ill. App. 3d at 992, 723 N.E.2d at 330. The employee contacted the employer on a regular basis seeking employment without success until five months after the initial arbitration hearing at which time the employer offered the injured employee a light-duty job at a rate of compensation much higher than was economically justifiable. Regarding this "offer" the *Reliance* court specifically stated as follows:

> "Reviewing the record, it is clear that the manifest weight of the evidence supports the Commission's determination that the job offer was a sham. The Commission properly gave no consideration to this 'offer' in reaching its conclusion that [the employee] was permanently and totally disabled because it was not a *bona fide* offer but, rather, was designed to circumvent Reliance's responsibility under the Act. Such practice must be strongly discouraged and even condemned. Employers must not be allowed to defeat an injured employee's entitlement to a disability award by making sham job offers. To countenance such practice would severely jeopardize injured workers' abilities to obtain relief and would undermine the spirit and purpose of the Act." *Reliance*, 309 Ill. App. 3d at 993, 723 N.E.2d at 331.

The same reasoning applies here.

It is clear that claimant was not qualified for the jobs "offered" by the employer, as claimant does not even possess a high school diploma. While claimant alleged management experience with previous employers when he applied for a job with the employer in 1987, this allegation appears to be nothing more than mere puffing. Most importantly, the employer only notified claimant about three open positions, but never actually offered the claimant any of the positions. The employer cannot be allowed to use this type of tactic to defeat claimant's entitlement to a wage differential award.

The facts here show that claimant realized he was qualified for few jobs; nevertheless, claimant, on his own volition, applied for a job with a security company after a vocational expert retained by the employer suggested such a position. Claimant was offered the position. He accepted the position only after the employer approved it. Claimant earns $7 per hour as a security guard, but earned over $19 per hour from the employer. Claimant showed sufficient evidence of impaired earnings. Under these circumstances, the circuit court's determination that the Commission's refusal to award a wage differential was against the manifest weight of the evidence was proper.

The circuit court remanded to the Commission for a determination of benefits under section 8(d)(1) of the Act. The Commission determined that claimant is entitled to a wage differential of $361.34 per week. One commissioner dissented, refusing to make an award pursuant to section 8(d)(1). The majority of the Commission, however, agreed with the circuit court that claimant is entitled to a wage differential. The Commission's order is thorough and shows that the Commission determined there was sufficient evidence of earning impairment to award claimant a wage differential. The circuit court confirmed the wage differential award. We agree.

For the foregoing reasons, the judgment of the circuit court confirming the Commission's award of a wage differential is affirmed.

Affirmed.

HOFFMAN and HOLDRIDGE, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:

The decision of the Industrial Commission entered August 16, 2001, should be reinstated. The Commission affirmed the arbitrator's award of 47¹/₇ weeks, temporary total disability, and awarded claimant "$439.89 per week for a period of 200 weeks, as provided in § 8(d)2 of the Act for the reason that the injuries sustained caused the permanent disability *** to the extent of 40%."

The arbitrator found that claimant "presented no evidence of an appropriate job search and no testimony from a vocational expert." A review of the trial court's findings shows that the trial court adopted and based its decision on the testimony of claimant. It is apparent from a review of the arbitrator's award and the Commission's decision that claimant was found not credible concerning any job search, or effort to secure work. At oral argument, claimant conceded the finding as to credibility. The Commission found claimant failed to inquire about employment opportunities and that claimant failed to prove entitlement to a section 8(d)1 award but did award 40% of man as a whole pursuant to section 8(d)2.

The trial court's reference to *Consolidation Coal Co. v. Industrial Comm'n*, 265 Ill. App. 3d 830, 838 (1994): "[w]hether a claimant has presented sufficient evidence of earnings impairment is a question of fact for the Commission, whose decision will not be reversed unless it is against the manifest weight of the evidence," and to *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 61 (1989), "[l]iability for workers compensation cannot rest on imagination, speculation or conjecture, but must be based solely upon the facts contained in the

record," supports the Commission's first decision. The majority has, as did the circuit court, simply reweighed the evidence and determined credibility in the place of the fact finder.

The order of the circuit court should be reversed and the August 16, 2001, decision of the Commission reinstated.

CALLUM, J., joins in the dissent.