CONSOLIDATION COAL COMPANY, Appellee and Cross-Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Charles Forbes, Appellant and Cross-Appellee.)

Fifth District (Industrial Commission Division)   No. 5—93—0401WC

Opinion filed June 21, 1994.—Rehearing denied September 9, 1994.

Harold B. Culley, Jr., of Culley & Wissore, of Raleigh, for appellant.

Michael F. Dahlen and Gary B. Nelson, both of Feirich/Schoen/Mager/Green, of Carbondale, for appellee.

JUSTICE SLATER delivered the opinion of the court:

Claimant Charles R. Forbes filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, par. 172.36 *et seq.*). Following a hearing on February 16, 1989, the arbitrator found that claimant had developed an occupational disease which arose out of and in the course of his employment. Claimant was awarded benefits for permanent partial disability pursuant to section 8(d)(1) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(d)(1)), as well as temporary total disability (TTD) benefits from March 31, 1986, through September 28, 1986, a total of $25^6/7$ weeks. The Industrial Commission (the Commission) affirmed the arbitrator's decision. On review, the circuit court, the Honorable E. Dan Kimmel presiding, confirmed the Commission's findings that claimant suffered an occupational disease arising out of and in the course of his employment, and it confirmed the award of TTD benefits. The court reversed, however, the Commission's decision that claimant was permanently partially disabled from his usual and customary employment, finding that claimant could have returned to work in some capacity without endangering his health.

On appeal to this court, claimant contends: (1) that the circuit court erred in denying his motion to dismiss based on an improperly executed appeal bond; and (2) that the circuit court erred in reversing the Commission's finding of permanent partial disability. The employer, Consolidation Coal Company, raises the following issues in its cross-appeal: (1) whether the Commission's finding that claimant developed an occupational disease arising out of and in the course of his employment was against the manifest weight of the evidence; (2)

whether the award of TTD benefits was against the manifest weight of the evidence; and (3) whether, assuming claimant was incapacitated from his usual and customary line of employment, the amount of the Commission's wage differential award was against the manifest weight of the evidence.

Claimant was born on February 10, 1951, and was 38 years old at the time of arbitration. He had worked at Consolidation Coal Company (the employer) for almost 13 years. Claimant began working at employer's Burning Star Mine Number 2 as a maintenance welder. He also did attendant work and occasionally acted as plant operator. Claimant next worked at employer's Burning Star Mine Number 5 in various positions including welder, tipple attendant, tipple operator, drill helper, dozer operator, and crane operator. His last job duty was scraper operator, which involved the use of excavating equipment in strip mining. Dust conditions in this job assignment were described by claimant as "bad," and on the claimant's last shift, March 30, 1986, operations were shut down due to dust. On that day, claimant became very ill and felt as if he were going to faint. He sat in the cab of the scraper until the end of his shift.

Claimant testified that his health problems began in December of 1985 when what he thought was a common cold became worse, and he began losing weight. His family physician, Dr. Corder, treated him for a cold and bronchitis and prescribed antibiotics. When claimant's condition did not improve, the antibiotic dosage was increased and a stronger antibiotic was used, but claimant did not respond to treatment. The day after he became ill at work, claimant went to Dr. Corder and explained what had happened. Again he was given a stronger antibiotic and was told to come back in three days if there was no improvement. Claimant's situation worsened, and his symptoms of chest pain, cough, and sputum intensified. He also continued to lose weight, dropping from approximately 215 pounds in December of 1985 to approximately 170 pounds by April of 1986. Dr. Corder ordered a chest X ray and tomogram on April 2, 1986. Claimant was then sent to the cancer ward at Barnes Hospital for additional tests, including a bronchoscopy and lung biopsy. These tests revealed that claimant was suffering from blastomycosis, and he was given an antifungal medication called Ketoconazole to shrink the grapefruit-sized tumor in his lung. After spending two weeks at Barnes Hospital, claimant returned home and continued to take the Ketoconazole for another six months.

Claimant notified the employer of his illness in April of 1986, and he received benefits for six months, through September of 1986. On September 29, 1986, claimant voluntarily terminated his employ-

ment. At the time of his resignation, claimant had a seniority rank of 63 out of 350. He had been trained in every job capacity except for electrical and dragline work. According to claimant, no matter what job classification he held, there was never a time when he was not exposed to dust at some point in the day. Claimant admitted that he had not applied for a job reclassification or transfer prior to his resignation. He explained that although he could bid for a job reclassification, the terms of his contract required that there be a job vacancy and that the bidder have the highest seniority. Claimant testified that he could not bid for a job reassignment or transfer because he was "frozen" under the contract. Under the contract, an employee had one down bid or one sideways bid for the entire term of the contract; once such a bid is made the employee can only bid up. Claimant had made no bid up because there were no vacancies.

After leaving the employer, claimant worked as a car salesman for six to eight weeks. He also worked at a correctional center in Hillsboro, Illinois, and at Lincolnland Community College as a welding shop instructor. At the time of the arbitration hearing, claimant was employed at Johnson County Community College in Overland Park, Kansas, as a metal fab instructor. He had held this position for one year.

Claimant testified that his chest still bothers him as he has pain in the upper left lobe of his lung. He also complained of a greater susceptibility to chest colds and less endurance. According to claimant, the last cold he had lasted two months.

Kent Eden testified by way of evidence deposition on behalf of the employer. He had been the employer's supervisor of industrial and employee relations for the past 10 years. In commenting on the dust conditions in positions held by claimant, Eden testified that claimant's prior position of plant operator was in a "fairly clean environment." According to Eden, claimant's prior positions as welder or coal oiler would not expose him to dirt dust. Eden also testified that claimant's past position of mobile crane operator does not create dust, although the crane does travel over different parts of the mine. Eden further testified that the employer had other positions which did not involve exposure to dirt dust, such as utility man, bath house attendant, plant welder, and silo attendant. According to Eden, claimant had never requested a transfer to a less dusty or dust-free environment.

Eden also testified that, by contract, the company is obligated to make an earnest effort to move an employee to a less dusty location if he requests it. He later acknowledged on cross-examination, however, that this obligation arises from the Federal Coal Mine

Health and Safety Act and only applies to coal miners with pneumo-coniosis. Eden did not know whether or not the employer would have allowed claimant to transfer for medical reasons. Eden also stated that under the contract an employee may bid into another available position, and during 1986 there were 86 opportunities to bid into different jobs. He did not know, however, how many of the 86 openings involved dust-free work.

When questioned concerning the number of hours claimant worked, Eden testified that he worked overtime, including Saturdays when scheduled. Claimant typically worked six days per week during the summer and fewer days in the winter, so that "on a yearly basis, he would probably work more than 40 hours a week."

The medical evidence presented at the arbitration hearing consisted of the deposition testimony and medical report of Dr. Peter Tuteur and the report of Dr. Robert Bruce. Dr. Tuteur is board certi-fied in both internal and pulmonary medicine. His practice consists primarily of consultation in pulmonary diseases. Dr. Tuteur examined claimant on May 9, 1986, at his request, and he concurred with the diagnosis of a left upper lobe infectious process due to blastomycosis. He explained that blastomycosis is a granulomatous infectious process within the lung caused by fungal organisms called blastomyces, which are regularly found in the soil. In claimant's case, "because of a combination of environmental and host factors, his body did not control the infection with blastomyces and he developed fever, chills, abnormal x-ray and an infection which required anti-fungal antibiotics to control." When asked whether the fact that claimant had worked for 14 years without infection suggested that the source of the infection originated outside the work environment, Dr. Tuteur replied:

"Well, he didn't do strip mining in the identical location for 14 years, okay? There are various different areas. And Blastomyces, just as well as any other fungal organisms, are not homogeneously distributed, but heterogeneously distributed, so that you can go to one one acre plot and find them and one one acre plot and not find them. So that that is one interpretation, but it assumes a *** ho-mogenous source of the organism. I don't believe the organism is distributed homogeneous[ly] throughout all the soil and all the subsoil in which he worked. For example, he may have just encountered on a particularly dry day an old starling roost and *** removed some of the dirt associated with that and got a very high inoculum."

Dr. Tuteur stated that the results of pulmonary-function studies he performed on claimant were normal, but he noted that the "tests

don't measure disability[,] [t]hey only measure impairment." Although claimant's infection was arrested, Dr. Tuteur stated that he is now at a greater risk than the general public if exposed to an environment where earth was turned. He explained that claimant is more likely to be a susceptible host for other soil-based fungal infections besides blastomycosis and therefore he should avoid exposure to airborne soil. For those reasons:

"[I]t was my recommendation to him to discontinue an activity such as his vocational activity was up to the time that I saw him in '86 and to seek alternate employment. He is not disabled from a respiratory standpoint. He is not disabled from a physical standpoint. It's just my medical judgment that to promote the best possible future health for [claimant] he should minimize the frequency and intensity of situations in which he may be exposed to airborne fungal organisms."

On cross-examination, Dr. Tuteur stated that he could not testify within a reasonable degree of medical certainty that if claimant returned to work with employer he would incur a second infection, but he was at greater risk than the general public. Dr. Tuteur acknowledged that claimant could have returned to work with the employer as long as that work did not involve a substantial exposure to dust. He also agreed that claimant could work as a welder or mechanic or equipment operator as long as he was not "downwind from a strip mining operation."

Finally, Dr. Tuteur's report, dated May 14, 1986, stated that claimant had inhaled dust while he worked which was quite likely to have contained blastomyces. The report concluded that it was "appropriate and reasonable to assume that the source of [claimant's] infection was the soil and dust in the workplace."

Dr. Robert Bruce did not examine claimant but reviewed Dr. Tuteur's report and deposition, claimant's records from Barnes Hospital, and reports by Doctors Charles Roper, Edward Corder, and Barbara Herwalt. Dr. Bruce stated that it was possible that claimant contracted blastomycosis during the course of his occupation. He based this opinion "on the probability of greater exposure to aerosolized dirt at his work place compared to other environments." Treatment with Ketoconazole had a high overall success rate in treating the disease and preventing a relapse. Dr. Bruce would place no restrictions on claimant's work activity providing that a complete recovery had been made.

On July 11, 1991, the employer filed an appeal bond in the circuit court signed by Leo S. Ogolini. Mr. Ogolini's authority to act for the employer was not stated, nor was he identified in any manner.

Claimant filed a special and limited appearance asking the court to quash the return of service on him and to dismiss the case for lack of jurisdiction. The Honorable William C. Schwartz denied the motion, finding that the bond was sufficient.

We now consider the issues raised by the parties on appeal. Claimant first contends that the circuit court erred in denying his motion to quash. Claimant argues that the signature of Leo Ogolini on the appeal bond is insufficient because there is no indication that he is an officer or agent with authority to bind the employer. *Deichmueller Construction Co. v. Industrial Comm'n* (1992), 151 Ill. 2d 413, 603 N.E.2d 516.

●1 In *Deichmueller*, our supreme court decided that its holding that an attorney's signature on an appeal bond was insufficient would only apply to bonds filed after the date of its decision. The bond in this case was filed prior to the *Deichmueller* opinion. Under the circumstances, we find that this case falls within the rule announced in *Deichmueller*, but because of that rule's prospective application, the circuit court properly denied claimant's motion to quash. See *J&J Transmissions v. Industrial Comm'n* (1993), 243 Ill. App. 3d 692, 612 N.E.2d 877 (noting prospective effect of *Deichmueller* and affirming denial of motion to quash where bond was signed by employee of principal's insurance company).

Claimant next contends that the circuit court erred in reversing the Commission's award of permanent partial disability benefits. The court found that the evidence established that claimant could return to work if he could be assured that he would not be exposed to dirt dust. The court then noted Eden's testimony that "there are numerous positions at the mine that do not require exposure to dirt dust." The court rejected claimant's testimony that no positions at the mine were free from dust because claimant had worked for nearly 12 years at different positions without experiencing symptoms related to blastomycosis. The court concluded that the weight of the evidence supported a finding that claimant could have returned to work in some other capacity without endangering his health.

Section 1(e) of the Act defines disablement as:

"[A]n impairment or partial impairment, temporary or permanent, in the function of the body or any of the members of the body, or the event of becoming disabled from earning full wages at the work in which the employee was engaged when last exposed to the hazards of the occupational disease by the employer from whom he or she claims compensation, or equal wages in other suitable employment; and 'disability' means the state of being so incapacitated." Ill. Rev. Stat. 1985, ch. 48, par. 172.36(e).

"Whether a claimant has provided sufficient evidence of disablement is a question of fact for the Commission to determine, and its decision will only be reversed if it is against the manifest weight of the evidence." (*Plasters v. Industrial Comm'n* (1993), 246 Ill. App. 3d 1, 8, 615 N.E.2d 1145, 1150.) A finding is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. (*Hicks v. Industrial Comm'n* (1993), 251 Ill. App. 3d 320, 621 N.E.2d 293; *Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 473 N.E.2d 548.) A reviewing court cannot disregard permissible inferences drawn by the Commission merely because different inferences may also be drawn from the same facts. (*Martin v. Industrial Comm'n* (1992), 227 Ill. App. 3d 217, 591 N.E.2d 108.) Moreover, "[r]esolving conflicts in the evidence, drawing inferences from the testimony, and determining the credibility of witnesses and the weight to be given their testimony are matters within the province of the Industrial Commission." *Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 406, 459 N.E.2d 963, 966.

●2 In this case we find that the circuit court erred in reversing the Commission's finding of permanent partial disability. It is clear from the evidence, particularly the testimony of Dr. Tuteur, that due to claimant's initial bout with blastomycosis he was at greater risk than the general public to contract subsequent fungal infections. Dr. Tuteur testified that claimant should avoid exposure to airborne soil, and he recommended that claimant seek other employment. "A workman is considered disabled for purposes of the Act when he can no longer work without endangering his life or health." (*Owens-Corning Fiberglas Corp. v. Industrial Comm'n* (1977), 66 Ill. 2d 247, 252, 362 N.E.2d 335, 337.) The circuit court found, however, that claimant could have returned to work without endangering his health. In doing so, the court accepted Eden's testimony concerning dust-free environments over that of claimant. The resolution of such evidentiary conflicts, however, is manifestly the province of the Commission, not the circuit court. In addition, the court's reason for rejecting claimant's testimony was flawed. The court relied on the fact that claimant had not experienced symptoms of blastomycosis while working at other positions but experienced symptoms only after he began operating the scraper. Presumably, the court therefore inferred that those previous positions were dust-free or at least nondangerous. However, as Dr. Tuteur explained, the fungal organisms are not distributed homogeneously throughout the soil. Merely because prior to claimant's illness he had not encountered a sufficient number of fungal organisms to become symptomatic does not establish that those positions were dust-free or safe. Accordingly, we find

that the circuit court erred in reversing the Commission's award of permanent partial disability benefits.

In its cross-appeal, the employer initially contends that the Commission's finding that claimant developed an occupational disease arising out of and in the course of his employment was against the manifest weight of the evidence. Employer argues that claimant was required to present medical testimony to establish to a reasonable degree of medical certainty that the disease arose out of and in the course of his employment. Employer notes that Dr. Tuteur and Dr. Bruce merely testified that the blastomycosis "likely" or "possibly" originated from claimant's employment, and Dr. Tuteur admitted that he did not know "what specific section of soil on the job or off the job *** initiated the infection." Employer maintains that the mere possibility of a causal connection is insufficient to support an award of compensation.

Section 1(d) of the Act provides in part:

> "A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence." Ill. Rev. Stat. 1985, ch. 48, par. 172.36(d).

In *Sperling v. Industrial Comm'n* (1989), 129 Ill. 2d 416, 544 N.E.2d 290, the supreme court stated that nothing in this statutory language required proof of a direct causal connection. The court noted that the legislature had explicitly changed this requirement in 1975 when it deleted the word "direct" from the statutory language set out above. Other decisions also make clear that "[a] finding of a causal relation may be based on a medical expert's opinion that an accident 'could have' or 'might have' caused an injury." (*Mason & Dixon Lines, Inc. v. Industrial Comm'n* (1983), 99 Ill. 2d 174, 182, 457 N.E.2d 1222, 1226; see also *Organic Waste Systems v. Industrial Comm'n* (1993), 241 Ill. App. 3d 257, 608 N.E.2d 1243.) In addition, a chain of events suggesting a causal connection may suffice to prove causation even if the etiology of the disease is unknown. See *Certi-Serve, Inc. v. Industrial Comm'n* (1984), 101 Ill. 2d 236, 461 N.E.2d 954.

●3 In this case, the evidence established that claimant was exposed to large amounts of airborne dust while working as a scraper operator. Conditions became so bad that operations had to be shut

down, and claimant became very ill and felt as if he were going to faint. Medical testimony established that the fungal organisms which caused blastomycosis are regularly found in the soil. Dr. Tuteur's report indicated that the dust claimant inhaled was "quite likely" to have contained blastomyces, and it was reasonable to assume that the source of claimant's infection was the soil and dust in the workplace. Dr. Bruce stated that it was possible that claimant contracted blastomycosis during his employment due to the probability of greater exposure to aerosolized dirt. Given the evidence, the Commission's finding that claimant contracted an occupational disease arising out of and in the course of his employment was not against the manifest weight of the evidence.

The employer next contends that the Commission's finding that claimant was entitled to TTD benefits from March 31 through September 28 of 1986 was against the manifest weight of the evidence. Employer relies on Dr. Tuteur's testimony that the results of pulmonary-function studies conducted on May 9, 1986, were normal. In addition, Dr. Tuteur also stated that at the time he examined claimant in May, his infection had been arrested and there was no evidence of continued active infection. Thus, argues employer, claimant was not entitled to TTD benefits for any period beyond May 9, 1986.

•4 A claimant's right to TTD benefits is a factual question which will only be reversed if the Commission's decision is against the manifest weight of the evidence. (*Owens-Corning*, 66 Ill. 2d 247, 362 N.E.2d 335.) The evidence established that claimant was treated with Ketoconazole, which was described as a potentially toxic medication, for six months after his hospitalization in April of 1986. Claimant testified that he was unable to return to work in September. In addition, Dr. Tuteur's physical examination of claimant in May of 1986 revealed dullness in the left upper lung fields with egophony, a bleating sound, indicating the pulmonary alveoli were filled with material such as fluid, inflammation, or scar tissue. The arbitrator awarded TTD from March 30, 1986, through July 14, 1986, and from July 15, 1986, through September 28, 1986, 25$^6/7$ weeks. The testimony of the claimant and Dr. Tuteur and reasonable inferences drawn therefrom support the Commission's award of TTD. The TTD award is not against the manifest weight of the evidence.

Finally, the employer maintains that the amount of the Commission's wage-differential award was against the manifest weight of the evidence. Specifically, employer contends that the Commission erred in calculating claimant's projected earnings with employer based on a six-day, 48-hour work week. Employer argues that there was

insufficient evidence that claimant worked every Saturday in the year preceding his disability.

Section 8(d)(1) of the Workers' Compensation Act provides:

"If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing his usual and customary line of employment, he shall *** receive compensation for the duration of his disability *** equal to 66²/3 % of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." Ill. Rev. Stat. 1985, ch. 48, par. 138.8(d)(1).

This section is applicable to the Workers' Occupational Diseases Act (see Ill. Rev. Stat. 1985, ch. 48, par. 172.42), and it indicates that the Commission should calculate wage-differential awards based on the amount the claimant would be able to earn at the time of the hearing if he were able to fully perform the duties of the occupation in which he was engaged at the time of the accident (*Old Ben Coal Co. v. Industrial Comm'n* (1990), 198 Ill. App. 3d 485, 555 N.E.2d 1201.) Overtime pay is specifically included as earnings under the Act. Ill. Rev. Stat. 1985, ch. 48, par. 172.45(g).

●5 In this case, claimant testified that he worked on Saturdays, and employer's supervisor, Kent Eden, stated that claimant worked Saturdays when scheduled. Eden also testified that "on a yearly basis, [claimant] would probably work more than 40 hours a week." Under the circumstances, we find that it was not unreasonable for the Commission to infer that claimant worked a 48-hour week.

The circuit court's judgment reversing the Commission's decision that claimant was permanently partially disabled is reversed, and the Commission's award of permanent partial disability benefits is reinstated. The circuit court's ruling on the motion to quash is affirmed.

Affirmed in part; reversed in part; award reinstated.

McCULLOUGH, P.J., and RAKOWSKI, WOODWARD, and RARICK, JJ., concur.