# Illinois Official Reports

## Appellate Court

<div style="border">

### *Omron Electronics v. Illinois Workers' Compensation Comm'n*,
### 2014 IL App (1st) 130766WC

</div>

| | |
|---|---|
| Appellate Court Caption | OMRON ELECTRONICS, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Craig Bauer, Deceased, by E. Belinda Bauer, Special Administrator, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division Docket No. 1-13-0766WC |
| Filed | November 14, 2014 |
| Rehearing denied | December 22, 2014 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the matter of a claim for the death of claimant's husband as a result of Neisseria meningitides shortly after he returned from a business trip to Brazil, the appellate court upheld the Workers' Compensation Commission's reversal of the arbitrator's denial of compensation based on the finding that the wife, as special administrator, failed to prove that her husband's death was caused by his exposure to the disease during the business trip, and the trial court's judgment confirming the Commission's finding that the special administrator did prove by a preponderance of the evidence that her husband contracted the disease during his business trip was affirmed, since the Commission's decision was not contrary to the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-51148; the Hon. Eileen Burke, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael E. Rusin and Jigar S. Desai, both of Rusin, Maciorowski & Friedman, Ltd., of Chicago, for appellant.

Anthony Cuda, of Cuda Law Offices, Ltd., of Oak Park, for appellee.

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1  This matter involves a claim under the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2006)) and the Workers' Occupational Diseases Act (Occupational Diseases Act) (820 ILCS 310/1 *et seq.* (West 2006)) filed by E. Belinda Bauer, wife and special administrator for Craig Bauer (employee), for benefits in connection with the death of the employee due to alleged exposure to Neisseria meningitides while on a business trip to Brazil for the employer, Omron Electronics. The arbitrator denied compensation finding that the special administrator had not proven causation and exposure arising out of and in the course of the decedent's employment with the employer. The special administrator appealed to the Illinois Workers' Compensation Commission (Commission). The Commission unanimously reversed the arbitrator's decision and held that the special administrator had proven by a preponderance of the evidence that the employee had contracted Neisseria meningitides during his business trip to Brazil. The employer filed a timely petition for review in the circuit court of Cook County, which confirmed the Commission's decision. The employer appeals.

¶ 2                            BACKGROUND

¶ 3  The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on May 24, 2011.

¶ 4  The special administrator testified that the employee had worked for the employer for four years as the company's president and chief operating officer. She testified that the employee traveled to China and Japan on June 7 through June 14, 2006. He then returned to Chicago and worked from his office in Schaumburg. The employee's travel itinerary was admitted into evidence. On June 20, 2006, he left Chicago at 2:55 p.m. and flew to Sao Paolo, Brazil. He arrived at 7:52 a.m. on June 21, 2006. He left Brazil on June 22, 2006, at 9:50 p.m. and arrived in Chicago at 9:30 a.m. on June 23, 2006.

¶ 5  The special administrator testified that when the employee returned home on June 23, 2006, she noticed that he was pale. They drove to their second home in Lake Geneva, Wisconsin. Instead of going out to dinner like they normally did, they opted to eat at home because the employee did not feel well. She stated that the employee was very tired, felt a little

achy, and thought he might have the flu. On June 24, 2006, the employee awoke early and went to have his hair cut. When he returned home he laid on the couch because he had a fever and was feeling very achy. She testified that throughout the day he continued to get worse. By late afternoon he developed little black spots all over his face and down his arms. The employee asked the special administrator to take him to the hospital. She took him to the Mercy Walworth Hospital and Medical Center emergency room in Walworth, Wisconsin. By the time they arrived at the hospital the employee's rash had spread all over his body. The employee continued to get worse and the medical staff decided to move him to an intensive care unit in Janesville, Wisconsin. He was taken by ambulance to St. Mercy Health System in Janesville, Wisconsin. He died there on June 25, 2006. The special administrator testified that the employee died of Neisseria bacterial meningitis.

¶ 6    The medical records from the Mercy Walworth Hospital and Medical Center emergency department were admitted into evidence. In patient notes written by Dr. Kevin Parciak, he noted that the employee was examined on June 24, 2006, for a complaint of a rash. The employee told Dr. Parciak that he had started to feel some mild upper respiratory tract illness symptoms approximately one week prior consisting of general malaise, nonproductive cough, and intermittent low-grade temperatures. He told Dr. Parciak that his symptoms had improved somewhat over the course of the week. The employee reported that at about 5 p.m. on June 24, 2006, reddish-purplish spots started appearing on his bilateral lower extremities and gradually ascended throughout the rest of his body over the course of the ensuing hours up until the time of presentation. The employee told Dr. Parciak that his only medication was Mucinex that he started taking that afternoon for a cough. The employee denied any specific bug bites, exposure to exotic foods, or exposure to any sick contacts specifically when travelling. Dr. Parciak noted diffuse nonpalpable purpuric rash lesions. His impression was purpuric rash due to infectious etiology. Dr. Parciak wrote that he "entertained the possibility of this patient having meningococcemia," but did not have a "high suspicion" of meningitis because the employee did not have a significant headache, neck pain, neck stiffness, or photophobia, although meningitis was still possible. He opined that it was likely that the employee was "septic from some unknown bacteria or viral cause which is especially concerning because of his recent travel history." The ambulance was contacted to transport the employee to St. Mercy Health System in Janesville, Wisconsin, and Dr. Parciak noted that the employee did not exhibit any signs of deterioration.

¶ 7    Dr. Badar Kanwar treated the employee on June 25, 2006, at St. Mercy Health System in Janesville. In his patient notes he wrote that the employee had been sick with cold-like symptoms since he returned from Japan, but that he only developed a rash, generalized malaise, and weakness that day. When the employee arrived at the hospital after transfer from the emergency room at Mercy Walworth Hospital and Medical Center, he was able to talk and answer Dr. Kanwar's questions appropriately. Dr. Kanwar noted that the employee appeared to be in respiratory distress. The employee appeared very cyanotic and had a diffuse purpuric rash all over his body. He wrote that the employee was intubated and sedated when he became bradycardic, went into asystole, and died. Unsuccessful efforts were made to resuscitate the employee. Dr. Kanwar noted that his total time caring for the employee was 90 minutes.

¶ 8    The autopsy report from St. Mercy Health System in Janesville was admitted into evidence. The final diagnosis was hemorrhagic adrenals consistent with Waterhouse-Friderichsen Syndrome, and premortem blood culture positive for Neisseria meningitides.

¶ 9        Dr. Charles Stratton testified by evidence deposition on behalf of the special administrator. He is the clinical director of the microbiology laboratory, an associate professor of pathology and medicine, and an associate director of the pathology residency program at Vanderbilt University in Nashville, Tennessee. He is board certified in internal medicine, infectious diseases, medical microbiology, and public health and medical microbiology. He testified that he had treated people with Neisseria meningitides since 1971.

¶ 10       Dr. Stratton testified that he had reviewed the employee's medical records from Mercy Walworth Hospital and Medical Center in Lake Geneva, Wisconsin, St. Mercy Health System in Janesville, Wisconsin, the death certificate, the autopsy report, and his itinerary. He stated that the report from Mercy Walworth Hospital that the employee had a purpuric rash that was even on his palms and soles of his feet was very significant because one of the few illnesses that causes a rash on a person's palms and soles is meningococcemia. Dr. Stratton testified that the clinician at Mercy Walworth Hospital diagnosed the employee with disseminated intravascular coagulation, which means sepsis syndrome. He stated that sepsis involves a cytokine storm, which makes blood vessels leaky as evidenced by the purpuric rash. Once the employee arrived at the hospital in Janesville, the medical records indicate that he had acute respiratory failure. Dr. Stratton stated that leaky blood vessels in the lungs caused this acute respiratory distress. He stated that the employee was intubated and sedated, then his heart stopped.

¶ 11       Dr. Stratton testified that the premortem blood cultures on June 24, 2006, grew Neisseria meningitides, which was significant because it confirmed the clinical impression from the first physician who examined the employee that he indeed had Neisseria meningitides in his blood. Dr. Stratton testified that Neisseria meningitides is another term for meningococcemia.

¶ 12       Dr. Stratton testified that he reviewed the autopsy report, which indicated that the employee died of meningococcemia. The death certificate listed the cause of death as Neisseria meningitides bacterium. He agreed with the cause of death listed on the death certificate.

¶ 13       Dr. Stratton testified that humans are the only natural reservoirs of Neisseria meningitides meaning that it is not something a person could get from drinking water, petting a cat, or cleaning a chicken coop. A person can only contract the infection from another human. Dr. Stratton testified that an individual can be exposed to meningococcal disease and become colonized, but not infected. These people are then carriers of meningococcal disease. Dr. Stratton stated that the most common method of transmission of Neisseria meningitides is airborne respiratory droplets. He stated that if a person is in an area with other people and someone who has colonized Neisseria meningitides coughs, sneezes, talks, or sings, the aerosolized droplets from his nasopharnyx get into the air and can be inhaled by someone else causing that person to contract the organism. The droplet nuclei remain in the room and circulate until the air system replaces the air with other air. He stated that depending on the air circulation, the droplet nuclei can float around for weeks, as was learned from the spread of diseases on submarines during World War II. He opined that, more likely than not, the Neisseria meningitides was transmitted to the employee through airborne respiratory droplets.

¶ 14       Dr. Stratton testified that the early symptoms of Neisseria meningitides are nonspecific, meaning the patient does not feel good, may have a low-grade fever, and has malaise. The symptoms do not include a sore throat, runny nose, cough, or sneezing, and it does not act like a cold or upper or lower respiratory tract infection. Dr. Stratton stated that a person who already had an upper respiratory tract infection is at greater risk to develop Neisseria

meningitides. Dr. Stratton noted that the employee's medical records show that he had a mild respiratory tract infection. Dr. Stratton testified that because the employee had a respiratory tract infection he was "primed or he had a cofactor that would make the likelihood of him not only becoming colonized but becoming infected with the Neisseria meningitides more likely."

¶ 15    Dr. Stratton testified that the incubation period for meningococcemia is 2 to 10 days. He stated that in the employee's case the concomitant respiratory tract infection acted as a cofactor and facilitated the meningococcemia so he thought the incubation period would be 2 days rather than 10 days.

¶ 16    Dr. Stratton testified that it was well known that international travel increases the risk for Neisseria meningitides infections. He stated that "Sao Paolo is well known in the medical literature, as well as among infectious disease specialists, as an area where there's an increased prevalence of Neisseria meningitides." He stated that the endemic rate of Neisseria meningitides is 2 to 5 per 100,000 people in Sao Paolo versus 1 per 100,000 in the United States.

¶ 17    Dr. Stratton testified that the employee was in Sao Paolo from June 21 to June 23, 2006, and became ill on June 24. He stated "the respiratory tract infection plus the likelihood of acquiring this organism while in Sao Paolo is the perfect–it's very good timing for the acquisition and dissemination of this organism, which became clinically apparent by June 24th." Dr. Stratton testified that "My opinion is that it was his international travel, specifically the trip to Sao Paolo, that allowed the meningococcemia that he died from to occur. Had he not gone to Sao Paulo or had any international travel, then it's my opinion that he wouldn't have died of Neisseria meningitides." He further stated that it was his opinion to a reasonable degree of medical certainty that the employee acquired meningococcemia in Sao Paolo as a result of his travel to that city. He stated, "I think that's the most likely source given the incidence of this pathogen in Sao Paolo as well as the timing of the trip and the subsequent meningococcemia. It all fits together quite nicely with acquisition of the organism while he was in Sao Paolo, probably facilitated or even accelerated due to a cofactor of the respiratory tract infection he was known to have–or reported to have, and that the timing is very consistent with acquisition of this organism." Dr. Stratton stated that while the most likely location that the employee contracted Neisseria meningitides was Sao Paolo, "[o]bviously, anything is possible."

¶ 18    Dr. Stratton testified that his opinions were based on his experience and training, and his ability to interpret the medical literature. He stated that he provided medical articles to support that he used evidence-based medicine in terms of coming to his decisions. The articles were admitted into evidence.

¶ 19    Dr. William Lawrence Drew testified by evidence deposition on behalf of the special administrator. He is the director of the virology laboratory at the University of California at San Francisco and the chief of infectious disease at the University of California San Francisco Medical Center. He has a Ph.D. in experimental pathology with an emphasis on virology and is board certified in internal medicine with a subspecialty in infectious disease.

¶ 20    Dr. Drew testified that he reviewed records from Mercy Walworth Hospital and Medical Center in Lake Geneva, Wisconsin, and St. Mercy Health System of Janesville, Wisconsin. Dr. Drew testified that as soon as he saw that the employee had been to Brazil, it was "a very major red alert to someone in [his] field because Brazil is known for an ongoing problem with meningococcus, this organism from which he expired, and they have had an ongoing problem

for years and years, and the estimates are they have at least three to six times the amount of problems with this organism in Brazil than we have in the U.S."

¶ 21    Dr. Drew testified that the employee's death certificate listed the cause of death as Neisseria meningitides bacterium and he agreed with this finding. He found it significant that the death certificate noted an interval between onset and death of one to two days. He felt this supported a very brief incubation period and a connection to the employee's exposure in Brazil. Dr. Drew stated that Neisseria meningitides is transmitted by the respiratory route. He testified that "there's no debate that he had meningococcal infection, and meningococcal infection is more prevalent in Brazil than it is here in the U.S. and his incubation period is completely compatible with having acquired it in Brazil. So, putting those two pieces of evidence together, yes, my opinion is that it's more probable than not that that is what took place." He stated that he believed that the employee acquired Neisseria meningitides as a result of his travel to Sao Paolo. He testified that the last day that the employee could have contracted the Neisseria meningitides bacteria was on June 22 or early on June 23, 2006, and the earliest he could have contracted it would have been June 14, 2006. Dr. Drew testified that "I can say that [the employee] would not have died at this time in his life from this infection had he not made that trip [to Brazil]."

¶ 22    Dr. Drew testified that typically a person who is infected with the Neisseria meningitides bacteria does not develop the clinical disease. A small subset may develop respiratory symptoms such as a pharyngitis, a sinusitis, or a runny nose. An exceedingly small subset will develop a more serious disease such as meningococcemia or meningococcal meningitis. Dr. Drew testified that the mild upper respiratory tract symptoms that the employee told Dr. Parciak about could have been due to Neisseria meningitides, but in his opinion were likely to have been a separate illness acquired before going to Brazil. He stated that it is the opinion of many experts that an ongoing prior infection may weaken a person's defenses against Neisseria meningitides. He stated it would be "hard to sort out whether this was really due to–all of it due to Neisseria meningitides or there was another process and then superimposed Neisseria meningitides acquisition in Brazil."

¶ 23    Dr. Drew testified that he reviewed Dr. Stratton's report and he agreed that he is someone who has sufficient expert qualifications to write opinions concerning Neisseria meningitides. He further averred that he agreed with Dr. Stratton's opinions.

¶ 24    A report from Dr. Jeffrey Coe dated November 15, 2006, was admitted into evidence. Dr. Coe is board certified in occupational medicine. He wrote that he reviewed medical records at the request of the employer relating to the care of the employee. Dr. Coe wrote that the employee became acutely ill with symptoms and clinical findings consistent with bacterial meningitis following his return from a business trip. He stated that Neisseria meningitides is spread through direct hand contact or droplets spread by coughing or sneezing from an asymptomatic carrier. He noted that the incubation period varies from 2 to 10 days. He opined that based on the information reviewed, it was his opinion that it would be impossible to state to a reasonable degree of medical certainty that the employee contracted bacterial meningitis during his business trip to Brazil in June 2006. He based this opinion on the fact that because the incubation period ranges from 2 to 10 days, it would be impossible to determine whether the employee was exposed to the bacteria before or during his trip to Brazil.

¶ 25    A report from Dr. Fred Zar dated August 22, 2007, was admitted into evidence. He is a professor of medicine, the vice head for medical education, and the program director for

internal medicine at the University of Illinois at Chicago. Dr. Zar wrote that after reviewing the employee's medical records at the request of the employer, it was clear that the employee died of meningococcal meningitis despite receiving timely and appropriate care. He wrote that carriers transmit the bacteria to another person via respiratory secretions. He wrote that the typical clinical manifestations of infection include an acute onset of fever, nausea, vomiting, headache, altered mental state, and severe muscle aches, and about 50% of infected people will have a rash. Dr. Zar noted that the incubation period for Neisseria meningitides is 4 days with a range between 2 and 10 days. The first symptom specific to meningococcal meningitis in the employee appeared to have been the rash which occurred on the evening of June 24, 2006. Dr. Zar opined that the bacterium was acquired 2 to 10 days prior to the appearance of the rash or sometime between June 14 and June 22, 2006. Because the average incubation period is four days, he opined that June 20, 2006, was most likely the date that the employee contracted the bacterium. Because of the incubation period, Dr. Zar opined that it was impossible for him to tell with any degree of medical certainty whether the employee contracted this bacteria in the United States or Brazil.

¶ 26      On December 3, 2008, Dr. Zar amended his report. He wrote that because the employee was only in Brazil for about 36 hours, the time period represents only 19% of the total range of known incubation for the disease, thus making it statistically more likely than not that it was not acquired in Brazil. He further noted that it was unlikely that the employee contracted his meningococcal infection on his flight to or from Brazil. Furthermore he provided printouts of information appearing on the Centers for Disease Control website that provides advice to travelers on risks of infectious diseases in Brazil. He noted that the website did not list an increased risk of meningococcal infection from travel to Brazil, nor did it recommend that travelers to Brazil receive the meningococcal vaccine.

¶ 27      Ricardo Moura testified by telephonic evidence deposition. He testified that he worked as a general manager for the employer in Sao Paolo, Brazil. He stated that he was interviewed for this position by the employee on June 22, 2006. He stated that he met with the employee at an employment agency's office. The meeting took about one-half hour. Mr. Moura testified that the employee "looked like a person that was a hundred percent fit and one that makes sports."

¶ 28      Marcos Ito testified by telephonic evidence deposition. He stated that he worked as the technical support manager for the employer in Sao Paolo, Brazil. Approximately 30 people worked at that office. He stated that on June 21, 2006, he met with the employee and Eduardo Penteado. Later the three had dinner together at a restaurant. Dinner lasted 45 minutes to one hour. The next day, the employee arrived at the office around noon after conducting interviews at the employment agency's office. Mr. Ito testified that the employee left the office at around 3 p.m. to go to the airport.

¶ 29      Eduardo Penteado testified by telephonic evidence deposition. He stated that he is the marketing and technology manager for the employer. He stated that he picked the employee up from the airport on June 21, 2006, and took him to the employer's office. Fifteen to twenty people worked inside the office. Mr. Penteado testified that the employee met with him and Mr. Ito, and possibly someone named Adriana. The meeting lasted two to three hours. He stated that he had dinner with the employee and Mr. Ito. They arrived at 8 or 9 p.m. The restaurant was two stories and it was not full. They talked among themselves and the only other person the employee spoke with was the waitress. He estimated that they were at the restaurant for two hours. He then drove the employee to his hotel and dropped him off. Mr. Penteado

testified that he picked the employee up from the hotel at about 9 a.m. the next morning and took him to the employer's office. He stated that he did not remember what the employee did that morning. He stated that the employee interviewed Mr. Moura, but he did not remember if that took place at the office or somewhere else. Mr. Penteado testified that if the employee went to the employment agency's office, he probably took a taxi. The interview was confidential and none of the employees at the employer's Sao Paolo office knew about it. Mr. bPenteado did not have breakfast or lunch with the employee and did not know if he ate with anyone else. The employee's expense report was admitted into evidence. It showed that he went to McDonald's on June 22, 2006. Mr. Penteado drove the employee to the airport on June 22, 2006. He did not remember how early the employee arrived at the airport. He stated that typically the employee arrived four to five hours prior to his flight. Mr. Penteado testified that the employee did not look like he had any symptoms that might have been the start of meningitis. He looked tired like a long-distance traveler.

¶ 30     The special administrator testified that the employee's health prior to June 25, 2006, was very good and that he was not under the care of a doctor for any reason. The special administrator testified that she helped the employee pack for his trip to China and Japan. She testified that he was physically fine and was excited about the trip because it involved an acquisition. She stated that she did not observe any physical problems or ailments on his return from China and Japan. She testified that before he left for Brazil, he did not have any physical problems or ailments that she was able to notice.

¶ 31     Stephen Kozik testified that he had been employed by the employer for 19 years. He stated that the employee was his mentor. He communicated with the employee daily by telephone, in person, and by email. He testified that on June 20, 2006, in an email he asked the employee how he was feeling and the employee responded "fine, but I think I got the bird flu in China." Mr. Kozik testified that he did not "know if it was tongue-in-cheek." He further testified that because the bird flu was news at the time, "he may have been joking around about being in China."

¶ 32     The arbitrator held that the employee did not sustain an accident/exposure that arose out of and in the course of his employment. He found that the special administrator failed to prove, by a preponderance of the evidence, that the employee was infected with Neisseria meningitides while in Brazil. He found that the evidence in total supported a finding that the employee contracted meningitis while in the United States before he left for Brazil.

¶ 33     The special administrator sought review of this decision before the Commission. The Commission unanimously reversed the arbitrator's decision. It found that the special administrator proved by a preponderance of the evidence that the employee acquired Neisseria meningitides during the course of his travels to Brazil. It found that the opinions of Dr. Stratton and Dr. Drew were more persuasive than the opinions of Dr. Coe and Dr. Zar. The Commission awarded the special administrator death benefits, burial expenses, and reasonable and necessary medical expenses in the amount of $10,359.69. The employer sought judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision. The employer appealed.

¶ 34                                          ANALYSIS

¶ 35     The employer argues that the Commission's decision was contrary to law as the evidence presented was legally insufficient to establish exposure. It argues that the Commission's

decision was based on the mere and remote possibility that the employee was exposed to Neisseria meningitides at some unknown time, in an unknown location in Sao Paolo, Brazil. It argues that the Commission's decision was thus based on speculation and conjecture. The employer's argument is not a legal argument, but one based on the sufficiency of the evidence. The Commission's factual findings are reviewed under the manifest weight of the evidence standard. *Johnson v. Illinois Workers' Compensation Comm'n*, 2011 IL App (2d) 100418WC, ¶ 17, 956 N.E.2d 543.

¶ 36    An occupational disease is a disease arising out of and in the course of employment. 820 ILCS 310/1(d) (West 2006). The claimant in an occupational disease case has the burden of proving that he suffers from an occupational disease and that a causal connection exists between the disease and his employment. *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120564WC, ¶ 21, 999 N.E.2d 382. Whether there is a causal connection between the disease and the employment is a question of fact. *Id*. It is the function of the Commission to decide questions of fact and its determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Id*. A finding is against the manifest weight of the evidence if an opposite conclusion is clearly apparent. *Id*.

¶ 37    In the instant case there is no dispute that the employee died as a result of contracting Neisseria meningitides. The issue is whether there was a causal connection between the disease and his employment.

¶ 38    The Occupational Diseases Act provides:

> "A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence." 820 ILCS 310/1(d) (West 2006).

"Nothing in the statutory language requires proof of a direct causal connection." *Sperling v. Industrial Comm'n*, 129 Ill. 2d 416, 421, 544 N.E.2d 290, 292 (1989). A causal connection may be based on a medical expert's opinion that an accident "could have" or "might have" caused an injury. *Consolidation Coal Co. v. Industrial Comm'n*, 265 Ill. App. 3d 830, 839, 639 N.E.2d 886, 892 (1994). "In addition, a chain of events suggesting a causal connection may suffice to prove causation even if the etiology of the disease is unknown." *Id*.

¶ 39    The employer argues that the opinions of Dr. Stratton and Dr. Drew were not based on relevant factual data concerning Neisseria meningitides infection rates in Brazil. It argues that the articles provided by Dr. Stratton and Dr. Drew did not support an increased risk of meningococcal infection for travelers to Brazil. The articles were admitted into evidence and were considered by the Commission in making its determination. Dr. Drew testified that Brazil is known for an ongoing problem with meningococcus. Dr. Stratton testified that Sao Paolo was well known among infectious disease specialists as an area where there is an increased prevalence of Neisseria meningitides. He testified that the endemic rate of Neisseria meningitides infection in Sao Paolo is 2 to 5 per 100,000 people and in the United States it is 1 in 100,000. Dr. Drew testified that Brazil has "3 to 6 times the amount of problems with this

organism" than in the United States. The Commission was aware of the statistical chance for an individual to contract Neisseria meningitides in Brazil.

¶ 40    The employer argues that the Commission's decision was based on the mere and remote possibility that the employee was exposed to Neisseria meningitides at some unknown time, in an unknown location in Sao Paolo, Brazil. It argues that the special administrator did not present any evidence that the employee was exposed to a specific carrier of Neisseria meningitides or that he was in any crowded areas in Brazil where there might have been an increased risk of infection.

¶ 41    Dr. Stratton, Dr. Drew, Dr. Coe, and Dr. Zar all agreed that Neisseria meningitides is transmitted through airborne respiratory droplets. Dr. Stratton and Dr. Drew testified that most people who are infected with Neisseria meningitides do not develop the disease, but are carriers. Dr. Zar wrote in his report that "once a new person acquires the organism, the vast majority of the time the person makes proteins (antibodies) to prevent the bacterium from penetrating the nasopharynx and entering the blood stream. Individuals who successfully create antibodies will not develop the symptoms but will become carriers." The employer argues that there was no evidence that the employee was in a crowded setting. It is true that a crowded setting increases a person's risk of contracting Neisseria meningitides because there is greater exposure to carriers. However, a person only needs to come into contact with respiratory droplets from one carrier to become infected. While in Brazil, the employee interviewed candidates for the position of general manager of the Sao Paolo office, traveled to the employment agency's office, most likely by taxi, stayed in a hotel, ate at McDonald's and one other restaurant, spent hours at the employer's Sao Paolo office, and spent several hours at the Sao Paolo airport. He was in contact with numerous people during his trip to Brazil, any one of whom may have been infected with Neisseria meningitides.

¶ 42    The employer argues that the employee had an upper respiratory tract infection before he left for Brazil and that it was a manifestation of meningitis. It asserts that these symptoms support a finding that the employee contracted Neisseria meningitides before he left for Brazil. Dr. Stratton testified that the early symptoms of Neisseria meningitides are nonspecific and do not include upper or lower respiratory tract infection symptoms. Dr. Zar wrote in his report that the clinical manifestations of the infections are an acute onset of fever, nausea, vomiting, headache, altered mental state, severe muscle aches, and in 50% of infected people a rash. He did not indicate that the symptoms include symptoms similar to those in respiratory tract infections. Dr. Drew testified that a small subset of people who are infected with Neisseria meningitides may develop respiratory symptoms such as pharyngitis, sinusitis, or a runny nose. Dr. Stratton testified that had respiratory tract infection symptoms been symptoms of Neisseria meningitides, the employee would have been sick in Brazil. No one testified that the employee was ill in Brazil. In fact, Mr. Moura testified that the employee "looked like a person that was a hundred percent fit and one that makes sports." Dr. Parciak testified that the employee told him his respiratory tract symptoms had been improving. Based on this evidence, the Commission could infer that the employee's upper respiratory tract infection was not a manifestation of Neisseria meningitides.

¶ 43    Both Dr. Stratton and Dr. Drew testified that a respiratory tract infection would weaken a person's defenses against Neisseria meningitides. Dr. Stratton testified that the employee's respiratory tract infection "facilitated or even accelerated" his development of Neisseria meningitides.

¶ 44    All four doctors agreed that the incubation period for Neisseria meningitides is 2 to 10 days. Dr. Stratton opined that, to a reasonable degree of medical certainty, the employee acquired meningococcemia in Sao Paolo. He felt that Brazil was the most likely location that the employee contracted Neisseria meningitides based on when the employee became ill, the timing of the trip to Sao Paolo, and the fact that the employee had a respiratory tract infection that facilitated or accelerated his contraction of the bacterium. Dr. Stratton averred that the incubation period in the employee's case was 2 rather than 10 days. Dr. Drew testified that the interval between the onset of the employee becoming ill and his death supported a very brief incubation period. He opined that the employee contracted Neisseria meningitides as a result of his travel to Sao Paolo. Dr. Coe and Dr. Zar testified that, based on an incubation period of 2 to 10 days, it was impossible to determine whether the employee was exposed to Neisseria meningitides before or during his trip to Brazil.

¶ 45    The Commission found that the opinions of Dr. Stratton and Dr. Drew were more persuasive than those of Dr. Coe and Dr. Zar. The Commission is charged with resolving conflicts in medical opinion evidence. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 597, 840 N.E.2d 300, 312 (2005). It is the function of the Commission to judge the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674, 928 N.E.2d 474, 482 (2009). We cannot say based upon the record before us that the Commission's decision is contrary to the manifest weight of the evidence.

¶ 46                                    CONCLUSION

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court confirming the decision of the Commission.

¶ 48    Affirmed.